**The STATE of Ohio, Appellee,**

v.

**KOVAC, Appellant.**

[Cite as *State v. Kovac,* 150 Ohio App.3d 676, 2002-Ohio-6784.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 18662.

Decided Dec. 6, 2002.

680

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Andrew T. French, Assistant Prosecuting Attorney, for appellee.

James S. Armstrong, for appellant.

Brian E. Kovac, pro se.

BROGAN, Judge.

{¶ 1}  Brian E. Kovac appeals from his conviction for forcible rape of a child under 13 years of age.  Kovac was sentenced to life imprisonment as a result of his conviction.

{¶ 2}  In late March 2000, 13–year–old R.L. reported to her mother that she had been raped by Brian Kovac in August 1997.  Shortly thereafter, her mother, T.S., took R.L. to the Miamisburg Police Department and met with Officer Joan Manning.  R.L. told Officer Manning that she was raped by Kovac in a storage room in a building located across the street from the Miamisburg Recreation Center.  R.L. told Manning that she was raped on a blue mat in the room, and so the officer searched the building pursuant to a search warrant and recovered a blue mat.  The mat was tested for trace evidence of the rape, but nothing of value was recovered.

{¶ 3}  R.L. testified at the trial that she knew Brian Kovac because he had lived with her friend, H.G. R.L. testified that in August 1997, she and H.G. were walking down to the Miamisburg Recreation Center (the "Burg Center"), when they encountered the defendant.  R.L. testified that Kovac asked them to go to a building near the recreation center where he was working so he could show them something.  R.L. testified that she went with Kovac but H.G. declined.

{¶ 4}  R.L. testified that Kovac led her into the building and to a storage room, where he proceeded to rape her.  She testified that she tried to resist Kovac but could not stop him.  R.L. testified that she did not know whether the defendant ejaculated or whether he wore a condom.  R.L. testified that Kovac told her during the rape, "I take it you're a virgin."  She said she thought he said that because "there was blood on the carpet, I guess, I don't know."  She did not remember seeing blood on the carpet remnant after she was raped.  She described the storage room as trashed, soiled, and dirty.  She said Kovac pulled her white sweat pants down and off before he raped her.

{¶ 5}  R.L. said she got up and ran out of the building and across the street to the Burg Center, where she saw her friend J.S. R.L. said that J.S. asked her why she was crying, and she said she told J.S. that Brian Kovac had raped her.  R.L. testified that when she got home she went immediately to the bathroom and saw that her panties had blood on them.  R.L. testified that she called for her mother to come see the blood and told her that she thought she had started her period.  R.L. testified that she did not really start her menstrual period until many months later.  R.L. said that she did not tell her mother the truth because she

thought she would get into trouble because her mother had forbidden her to be with Brian Kovac.

{¶ 6}  R.L. said that she did not tell her mother about the rape until three years later when her mother saw her crying while having a phone conversation with her friend U.C. R.L. said that she had told U.C. about the rape and she began crying when U.C. threatened to reveal the rape incident.  R.L. said that she finally told her mother about the rape because she thought she needed to know about it.  R.L. said her mother took her to the Miamisburg Police Department, where she told the police about the rape.  She said that she accompanied Detective Scott Marsh to the site of the rape.  R.L. said she told Marsh about the blue carpet remnant that the rape occurred on, but he recovered a mat that was different from the one she had seen in the building three years earlier.  R.L. was asked by the prosecutor if she had ever lied before.  She replied that she had lied about cleaning her room, doing her homework, and school detentions.  She denied ever lying about being raped.  She insisted that she was telling the truth about her rape accusation against Kovac.

{¶ 7}  J.S. testified that she was a good friend of R.L. although she was a few years older than R.L. She testified that she remembered the incident in 1997 when R.L. told her about how the defendant had raped R.L. She said that R.L. came inside the recreation center and was crying and her makeup was smeared from crying.  She said that she took R.L. outside and asked her what was wrong with her and R.L. replied that Brian Kovac had forced her to have sex with him.  J.S. testified that she was very angry when R.L. told her about the rape and she said that she wanted to find Kovac and confront him about it.  J.S. testified that she never told anyone about R.L.'s accusation "because she asked me not to say nothin' to nobody."  J.S. testified that she never confronted Brian Kovac about R.L.'s accusation because she was scared for herself then.  "I didn't know what he might do."

{¶ 8}  R.L.'s mother, T.S., testified that she remembered the incident in August 1997 when her daughter was upset and asked to come to her bathroom and observe blood on her panties.  She said that R.L. told her "something was going on" but she didn't tell her about the rape.  T.S. said that she attributed the blood to her daughter starting her period, although she thought R.L. was awfully young to be starting menstruation.  T.S. testified that she had specifically informed R.L. not to "hang out" with Brian Kovac, since he was older and liked to be around kids and she did not think that that was right.  T.S. testified that she did not learn of her daughter's rape accusation until March 30, 2000, when she observed her daughter crying and sobbing while talking to a friend on the telephone.  T.S. said that she asked why her daughter was so upset and after much prodding R.L. told her about the rape in 1997 involving the defendant.

T.S. said that she took her daughter to the Miamisburg Police Department and also to Children's Hospital for treatment.

{¶ 9}   On cross-examination, T.S. admitted that she told the doctor at Children's Hospital that her daughter had been lying, sneaking around, and running with a racy crowd for approximately two years.  T.S. said that she did not notice anything unusual about her daughter's clothing on that day in August 1997 and that she did not observe any bruising or scratches on her.

{¶ 10}   On redirect examination, T.S. was asked the following questions by the prosecutor:

{¶ 11}   "Q. Mr. Hodge asked you if you told the doctor at Children's Medical Center that [R.L.] had been lying and sneaking around and running with a racy crowd.  Had she ever done that before the rape?

{¶ 12}   "A. No.

{¶ 13}   "Q. Did that behavior start after when you now know the rape to have occurred?

{¶ 14}   "A. Yes.

{¶ 15}   "Q. When you say your daughter was lying, can you tell me what kind of things she lied to you about?

{¶ 16}   "A. Not completing her homework, not doing her chores, uh ... having gum in her purse to take to school when she's not supposed to.

{¶ 17}   "Q. Can you generally tell—or can you tell when [R.L.'s] lying?

{¶ 18}   "A. Yes.

{¶ 19}   "Q. Can [R.L.] hold up under repeated questioning by you?

{¶ 20}   "A. No.

{¶ 21}   "Q. Do you have any reason to believe that your daughter is lying about being raped?

{¶ 22}   "A. No.

{¶ 23}   "MR. HODGE:  Objection."

{¶ 24}   H.G., age 15, testified that she was a close friend of R.L. She testified that the defendant and his wife were living with her and her mother at the time of the August 1997 crime.  She testified that Brian Kovac approached her and R.L. when they were walking to the Burg Center in the summer of 1997 and asked whether they wanted to go into the storage building and see something.  H.G. said that she declined Kovac's offer but that R.L. went with Kovac.

{¶ 25}   Shane Burns testified that he was in the Montgomery County Jail with Brian Kovac while Kovac awaited trial on the rape charge.  Burns said that he

first met Kovac when they both were in grade school in Miamisburg. He said that Kovac admitted to having sex in a storage room with the girl he was charged with raping three years earlier. Burns admitted having an extensive criminal record but denied that anyone offered him any concessions for his testimony. On cross-examination, Burns admitted that he had been placed on probation for multiple burglary offenses in Montgomery County after he signed a written statement implicating Kovac in the rape of R.L.

{¶ 26} Dr. Ralph Hicks, a pediatrician at Children's Hospital, testified that he examined R.L. at the hospital on August 12, 2000. Dr. Hicks said that he reviewed a medical history that included R.L.'s statement that she had been sexually assaulted (penile/vaginal penetration about three years earlier with bleeding from the vaginal area).

{¶ 27} Dr. Hicks testified that he conducted a genital examination of R.L. and found that her hymen appeared normal and intact. He testified that the chance of observing physical findings specifically related to a three-year-old sexual assault would be relatively low. Dr. Hicks testified that if there were injuries to the soft tissues in the genital or vaginal area, most of the injuries were not sufficiently deep and scarring occurs during the healing process. He testified that this process makes it increasingly less likely that he would be able to detect any residual evidence of sexual assault.

{¶ 28} Dr. Hicks also testified that as a girl progresses through puberty, her hormone levels increase, thickening the hymen with extra folds of tissue, making it more difficult to detect any abnormalities. Dr. Hicks also noted that specific sexual-assault findings are found in only about 15 percent of all child-sexual-assault cases. On cross-examination, Dr. Hicks conceded that when a victim indicates that there was vaginal penetration, pain, and bleeding, studies indicate that in 80 percent of these cases physical findings of abuse are found. On redirect examination, Dr. Hicks noted the 80 percent figure is from exams at varying points from the time of the assault with findings less likely as time passes.

{¶ 29} Tuesday Ross testified that she was the owner of the building where the alleged rape occurred. She testified that her father kept his tools and other materials in the storage room and that the room was in disarray constantly. She testified that no carpeting had been removed from the storage room.

{¶ 30} Brian Kovac testified and denied raping R.L. He said he was 23 years of age and was married with two children. He denied ever telling Shane Burns that he had raped anyone. Kristen Kovac, appellant's wife, testified that she never noticed any change in R.L. when R.L. was visiting H.G. after the alleged rape. She also said that R.L. did not seem afraid of her husband.

{¶ 31} In his first assignment of error, Kovac argues that the trial court committed prejudicial error in permitting the victim's mother to testify that she had no reason to disbelieve her daughter's claim that Kovac had raped her.

{¶ 32} The state admits that a trial court errs when it permits a lay witness to testify concerning another witness's veracity. The state argues, however, that the error was invited by Kovac's counsel's cross-examination of T.S. regarding R.L.'s recent history of lying. The state also argues that the admission of this testimony was harmless beyond a reasonable doubt because of the independent evidence of Kovac's guilt.

{¶ 33} Evid.R. 103(A) provides that error may not be predicated upon a ruling that admits or excludes evidence unless a substantial right of the party is affected and, if the ruling is one admitting evidence, a timely objection or motion to strike appears of record stating the specific ground of objection, if the specific ground was not apparent. In this case, counsel did not object until T.S. answered the improper question propounded by the prosecution. When counsel did object, the trial court overruled the objection without explanation.

{¶ 34} In *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220, the Ohio Supreme Court held that an expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant who claims she has been raped. In *Boston*, the court held that the trial court committed prejudicial error in allowing a physician to express her opinion that the child had not fantasized her abuse and had not been programmed to make accusations against her father. Justice Douglas noted that this testimony by the physician in effect declared that the child was being truthful. Justice Douglas wrote the following:

{¶ 35} "We have little difficulty in finding that the admission of this testimony was not only improper—it was egregious, prejudicial and constitutes reversible error. In [*State v.*] *Eastham* [ (1988), 39 Ohio St.3d 307], at 312, 530 N.E.2d at 414, Justice Brown, concurring, stated that such an opinion '* * * acted as a litmus test of the key issue in the case and infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility. * * * In our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses.'" Id. at 128–129, 545 N.E.2d 1220.

{¶ 36} In *State v. Dale* (July 14, 1992), Greene App. No. 91–CA–25, 1992 WL 164009, we found that trial counsel was constitutionally ineffective for not objecting to the testimony of a police officer, a victim advocate, and a physician who all stated their opinions that the young accuser was telling the truth. We noted that the accuser's testimony was essentially uncorroborated and that

therefore the appellant's trial was fundamentally unfair, and we reversed the defendant's conviction and ordered a new trial.

{¶ 37} In *State v. Miller* (Jan. 26, 2001), Montgomery App. No. 18102, 2001 WL 62793, this court affirmed a defendant's rape and gross-sexual-imposition convictions despite police officers' testifying as to their opinion of the truth of the victim's accusations in violations of *Boston*. Judge Wolff wrote the following on behalf of the court:

{¶ 38} "The state argues that the police officers' testimonies did not violate *Boston* because the police officers were not testifying as experts in this case. This argument is not persuasive for two reasons. First, we believe that jurors are likely to perceive police officers as expert witnesses, especially when such officers are giving opinions about the present case based upon their previous experiences with other cases. Second, and more importantly, the language of *Boston, supra*, makes it clear that the holding of that case applies to lay persons as well as experts. *Boston*, 46 Ohio St.3d at 129, 545 N.E.2d at 1240. * * * Thus, regardless of whether a police officer testifies as an expert or lay witness, his testimony cannot violate *Boston*.

{¶ 39} "The police officers' testimonies, *supra*, were in direct violation of *Boston* because they offered an opinion as to the truth of Bowman's accusations. See *State v. Coffman* (1998), 130 Ohio App.3d 467, 474, 720 N.E.2d 545, 550. In effect, their testimonies declared that Bowman's statements were truthful and that Miller had committed the alleged acts against her. As such, they infringed upon the role of the jury which, as the fact finder, was charged with assessing the veracity and credibility of Bowman and Miller. Although it might appear that the state elicited these testimonies to counterbalance the jury's natural tendency to assess Bowman's delayed disclosure to authorities and her lie to Miller as weighing against her believability and truthfulness as is permitted by [*State v.*] *Stowers* [81 Ohio St.3d 260, 690 N.E.2d 881] the context in which these testimonies were given and the overall record do not support that conclusion. Instead, it is clear on this record that these questions were attempts by the state to include the police officers' testimonies regarding the truthfulness of Bowman. See *Coffman*, 130 Ohio App.3d at 474, 720 N.E.2d at 550. We thus conclude that the admission of the officers' testimonies was improper.

{¶ 40} "We must determine, however, whether such error was harmless beyond a reasonable doubt in this case. The erroneous admission of statements in violation of *Boston* is more likely to be harmless if the case involved a bench trial instead of a jury trial. See *Coffman*, 130 Ohio App.3d at 476, 720 N.E.2d at 551. Further, the erroneous admission of statements in violation of *Boston* is more likely to be prejudicial if the case was essentially a 'credibility contest' between the victim and the defendant without independent evidence of the

alleged crimes. *State v. Palmer* (Feb. 8, 1995), Medina App. No. CIV.A. 2323–M, unreported [1995 WL 48442].

{¶ 41} "We recognize that the Ninth Appellate District has stated that the admission of statements in violation of *Boston* can be harmless 'if the victim testifies and is subject to cross-examination, the state introduces substantial medical evidence of sexual abuse, and the expert's testimony is cumulative to other evidence.' *State v. Kincaid* (Oct. 18, 1995), Lorain App. Nos. 94CA005942, 94CA005945 [1995 WL 608407], unreported; see, also, *Palmer, supra.* Those cases, however, are distinguishable from the case before us. *Kincaid* involved the rape and gross sexual imposition of a victim that was six years old or younger. *Palmer* involved the felonious sexual penetration of a victim who was seven years old. It is understandable that the court required substantial medical evidence of the sexual abuse when the victims in *Kincaid* and *Palmer* were so young. Our case is distinguishable, however, because it involved a teenage girl *consenting* to sexual acts under a threat of force. Further, Bowman alleged that she had performed oral sex on Miller and that he had inserted his finger into her vagina. Neither of those actions would be likely to leave detectable medical evidence. Thus, because the facts of our case are dissimilar, we will not follow the holdings in *Kincaid* and *Palmer* in this case.

{¶ 42} "While the case before us was tried to a jury and did essentially involve a credibility contest between Miller and Bowman, the record in this case leads us to conclude that the trial court's error in allowing the challenged testimony was harmless beyond a reasonable doubt. Although the accounts offered by Bowman and Miller varied greatly, independent evidence of the alleged crimes was introduced to the jury. During the trial, tape recordings of phone conversations between Miller and Bowman were played for the jury. Those tapes offered abundant evidence that he had committed the alleged crimes and that Bowman's allegations were, in fact, true. During these conversations, Bowman made references to having been previously forced to perform sexual acts for Miller against her will and Miller did not dispute or question such references. Further, Miller referenced previous threats that he had issued toward Bowman, her family, and friends. He also made multiple violent, and at times quite graphic, threats toward Bowman, her family, and friends while talking to her. Not only did the taped phone conversations reveal evidence which clearly corroborated Bowman's accusations, but in listening to the tapes, the jurors heard Miller, in his own voice, offer corroboration for Bowman's allegations. Thus, in light of all of the evidence presented at trial, we cannot conclude that the admission of the challenged statements prejudicially affected the fairness or result of Miller's trial. The trial court's admission of the challenged statements was, therefore, harmless beyond a reasonable doubt.

{¶ 43} "As we come to this conclusion, however, we must caution the state. *Boston* makes it clear that witnesses are not to offer opinions on the truthfulness of a victim's accusations. The state elicits such opinion evidence at its peril, particularly where the evidence essentially involves a credibility contest and significant independent evidence of the offenses—unlike in this case—is lacking."

{¶ 44} The state argues that the *Boston* violation on the prosecutor's redirect examination was invited by defense counsel's cross-examination of T.S. regarding her daughter's recent history of lying. The state argues that the obvious import of this line of inquiry was to shed doubt upon the credibility of R.L.'s accusation against Kovac. The state argues that the prosecutor was merely attempting to rehabilitate R.L.'s mother by asking her whether she had any reason to doubt her daughter's claim that Kovac had raped her.

{¶ 45} Under the settled principle of invited error, "[a] party will not be permitted to take advantage of an error which he himself invited or induced." *State v. Bey* (1999), 85 Ohio St.3d 487, 493, 709 N.E.2d 484. See, also, *State v. Jones* (1996), 114 Ohio App.3d 306, 322, 683 N.E.2d 87 ("A party who invites an error may not demand from the appellate court comfort from its consequences"). We agree with the state that Kovac's counsel obviously pursued this line of inquiry with R.L.'s mother in order to suggest to the jury that R.L.'s accusation against his client was a fabrication, but we do not agree that this line of inquiry opened the door so as to permit the mother to express her opinion as to her daughter's truthfulness as to the rape accusation.

{¶ 46} Invited error and the opening of the door to an area of inquiry with a witness are different evidentiary concepts. In *State v. Bey,* supra, the Ohio Supreme Court held that the defendant in a capital case could not complain about an instruction given to the jury that he himself requested. In *State v. Seiber* (1990), 56 Ohio St.3d 4, 564 N.E.2d 408, the Ohio Supreme Court held that a capital defendant invited error when he failed to redact a prior criminal record from a defense exhibit.

{¶ 47} In this case, defense counsel did not invite the victim's mother to offer her opinion as to whether her daughter was telling the truth. Defense counsel merely asked T.S. whether it was not true that she had reported to the physician that her daughter had been lying for approximately two years. It was fair for the prosecutor to ask T.S. what things her daughter had been lying about to show that it concerned minor matters such as homework and school detention. Not satisfied with this limited rehabilitation of T.S., the prosecutor then sought the opinion from T.S. that *Boston* condemns as egregious, prejudicial, and reversible error.

{¶ 48}   The state argues in the alternative that the *Boston* violation was harmless beyond a reasonable doubt because of the strength of the state's case against the defendant.  We disagree.  In *Miller*, supra, we held that the *Boston* violation was harmless because the victim witness was a teenager when the charged offense was not likely to leave detectable medical evidence.  Also the tape recordings in *Miller* provided substantial corroboration of the offense charged for the jury and for this court to hear.  There was no significant medical or physical evidence to corroborate the charged offense, and the victim waited three years to tell any adult about the crime.  There was corroboration by way of H.G.'s testimony, the fresh report to J.S., and the blood in the victim's panties.  However, we cannot say with any comfort level that the admission of the challenged statements were harmless beyond a reasonable doubt.  The first assignment of error is sustained.

{¶ 49}   In his second assignment, Kovac contends that his trial counsel was constitutionally ineffective.  Specifically, he alleges that his trial counsel was ineffective in not objecting in a timely manner to the testimony of T.S. when she stated that she had no reason to disbelieve her daughter's accusation of the defendant.  We agree that counsel did not state his objection before T.S. gave her objectionable answer, but it does not appear that the trial judge overruled the objection because it was not timely.  Secondly, Kovac contends that his trial counsel was ineffective in not objecting to the hearsay testimony offered by J.S.  Kovac contends that J.S.'s testimony was not admissible under the exception provided for excited utterances, because R.L.'s statement was not the product of a startling event but was merely a reflective discussion of an upsetting event.  He contends that there was sufficient time from the alleged crime to the statement for any nervous excitement in R.L. to lose domination of her reflective faculties.

{¶ 50}   Upon review, we find Kovac's second assignment of error to be unpersuasive.  In *State v. Duncan* (1978), 53 Ohio St.2d 215, 7 O.O.3d 380, 373 N.E.2d 1234, the Ohio Supreme Court set forth a four-part test to determine whether a statement qualifies as an excited utterance.  In particular, the court held that "[t]estimony as to a statement or declaration may be admissible under an exception to the hearsay rule for spontaneous exclamations where the trial judge reasonably finds (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to

remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration." Id. at paragraph one of the syllabus.

{¶ 51} In *State v. Wallace* (1988), 37 Ohio St.3d 87, 524 N.E.2d 466, the Supreme Court established guidelines under which declarations made in response to questioning could be admissible as excited utterances. The questioning must be neither coercive nor leading, it must facilitate the declarant's expression of what is already the natural focus of the declarant's thoughts, and it must not destroy the domination of the nervous excitement over the declarant's reflective faculties. Id. at 93, 524 N.E.2d 466.

{¶ 52} In *State v. Huertas* (1990), 51 Ohio St.3d 22, 553 N.E.2d 1058, the Ohio Supreme Court held that the victim's tape-recorded statement describing the defendant's attack, made 30 to 45 minutes after the defendant stabbed him, was admissible as an excited utterance. In *State v. Boston*, the Ohio Supreme Court held that a statement made by a two-and-one-half-year-old child to her mother alleging sexual abuse several hours after the incident occurred was admissible.

{¶ 53} In *State v. Taylor* (1993), 66 Ohio St.3d 295, 612 N.E.2d 316, the Ohio Supreme Court addressed the standard of review that an appellate court should apply when analyzing a trial court's application of the foregoing four-part test. In *Taylor*, the court first noted that " '[t]here may be instances in which a decision to reject such a declaration will appear to a reviewing court almost as reasonable as a decision to admit it; and vice versa.' " Id. at 304, 612 N.E.2d 316, quoting *Potter v. Baker* (1955), 162 Ohio St. 488, 499, 55 O.O. 389, 124 N.E.2d 140. In such a case, a trial court's ruling should not be disturbed. Id. As the *Taylor* court explained, " 'the trial judge, in determining whether this declaration was admissible, necessarily had to decide certain questions of fact. If his decision of those questions of fact, as reflected in his ruling on the admissibility of this declaration, was a reasonable decision, an appellate court should not disturb it. In other words, * * * the decision of the trial judge, in determining whether or not a declaration should be admissible under the spontaneous exclamations exception to the hearsay rule, should be sustained where such decision appears to be a reasonable one, even though the reviewing court, if sitting as a trial court, would have made a different decision.' " Id. at 304–305, 612 N.E.2d 316, quoting *Potter*, 162 Ohio St. at 499–500, 55 O.O. 389, 124 N.E.2d 140.

{¶ 54} With the foregoing standards in mind, we cannot say that counsel was ineffective in not interposing an objection to R.L.'s statements to J.S. To the

contrary, counsel may have concluded that an objection to the testimony would be fruitless, since the trial court could reasonably have found that Kovac's act of raping R.L. was a startling occurrence that produced nervous excitement sufficient to render R.L.'s statements spontaneous and unreflective. The trial court also reasonably could have found that R.L.'s statements were made before there was time for her nervous excitement to lose its domination over her reflective faculties, so that the statements remained a sincere expression of her actual impressions and beliefs.

{¶ 55} Kovac also argues that his counsel was constitutionally ineffective in not objecting to J.S.'s testimony that when she saw R.L. at the recreation center, R.L. was "feeling very emotionally sad." The state argues, and we agree, that this testimony is admissible pursuant to Evid.R. 701, which permits lay witnesses to offer opinions that are rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony.

{¶ 56} In applying Evid.R. 701, courts have found that a lay witness is permitted to testify about another's emotional state when the testimony is based upon personal observations. See *State v. Sibert* (1994), 98 Ohio App.3d 412, 426, 648 N.E.2d 861; *State v. Morris* (1982), 8 Ohio App.3d 12, 8 OBR 13, 455 N.E.2d 1352; *Crane v. Lakewood Hosp.* (1995), 103 Ohio App.3d 129, 133, 658 N.E.2d 1088. Even assuming that this testimony was inadmissible, counsel's failure to object to it was harmless at best in light of J.S.'s testimony that she observed R.L. crying, wiping her eyes, and weeping.

{¶ 57} Kovac argues that his counsel was ineffective in not objecting to T.S.'s hearsay testimony concerning the details surrounding R.L.'s telling her in 2000 of the rape three years earlier. While we agree that that testimony was hearsay if offered for evidence that the rape occurred, it appears to have been offered to explain how R.L.'s mother first came to know of the alleged rape and what steps she took in regard to the accusation by her daughter. See *State v. Thomas* (1980), 61 Ohio St.2d 223, 232, 15 O.O.3d 234, 400 N.E.2d 401 (holding that a declarant's out-of-court statements are admissible to explain the actions of a witness to whom the statement is made). In any event, R.L. had already testified that she had told her mother in 2000 about the rape three years earlier. Similarly, T.S.'s testimony that R.L. told her stepfather about the rape was not offered to prove that the rape occurred but to explain what actions were taken after the accusation by R.L. was made.

{¶ 58} Kovac also contends that his counsel was ineffective in not objecting to T.S.'s testimony that she had instructed her daughter not to hang out with Kovac because he liked to be around kids and she did not think that that was right. We agree with the state that this testimony was relevant as a possible

explanation for why R.L. did not report the rape to her mother until three years later.

{¶ 59} Kovac contends that his trial counsel was ineffective in not objecting to two redirect examinations of J.S. and H.G. Kovac fails, however, to show how this redirect testimony harmed him, and, in any event, the trial court has wide latitude in permitting redirect examination, and an objection would certainly have been overruled by the trial court.

{¶ 60} Kovac argues that counsel should have objected to Detective Marsh's testimony that R.L. reacted "with immediate response of fear" when he showed his photograph to R.L. to confirm Kovac's identity. We agree with the state that Marsh's testimony was not hearsay. We believe that this testimony, however, was only marginally relevant and was outweighed by its prejudicial effect. The identity of R.L.'s alleged attacker was not in question, so Kovac's counsel should have objected to this line of questioning. See Evid.R. 403. However, we fail to see how the outcome of this trial was in any way affected by the admission of this testimony.

{¶ 61} Kovac also contends his counsel should have objected to Shane Burns's testimony that he was no longer a friend of his because he could not be friends with someone "who does something to a little girl that ain't done nothin' to the world." We agree with Kovac that this testimony was irrelevant and improper and counsel should have moved to strike it. However, this testimony likewise was not likely to have affected the outcome of Kovac's trial.

{¶ 62} Kovac argues that his trial counsel was constitutionally ineffective for opening the door to the line of questioning pursued by the prosecutor with T.S. concerning whether she believed her daughter's accusation about him.

{¶ 63} Claims of ineffective assistance of counsel are assessed against the two-part test of *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. As stated in *State v. Madrigal* (2000), 87 Ohio St.3d 378, 388–389, 721 N.E.2d 52:

{¶ 64} "To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Strickland v. Washington* (1984), 466 U.S. 668, 687–688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693."

{¶ 65} "Judicial scrutiny of counsel's performance must be highly differential." *Strickland* at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373. A court must presume that a broad range of choices, perhaps even disastrous ones, are made on the basis of a tactical decision and do not constitute ineffective assistance of counsel. *State v. Carpenter* (1996), 116 Ohio App.3d 615, 626, 688 N.E.2d 1090, citing *Bradley* at 144, 538 N.E.2d 373.

{¶ 66} In this case, R.L.'s credibility was crucial to the outcome of the prosecution's case. Having learned that R.L.'s mother had told the physician that R.L. had been lying and sneaking around for two years, counsel believed that this line of inquiry would demonstrate to the jury that R.L. was not credible concerning the rape accusation. Cross-examination often produces mixed results, and we cannot say that counsel's foray into this area that opened the door to the state's objectionable redirect examination was beyond the range of reasonable representation. Accordingly, the second assignment of error must be overruled.

{¶ 67} In his third assignment, Kovac contends his conviction was against the manifest weight of the evidence. He contends that the state produced no witnesses to the alleged rape except an incredible witness. He notes that there was no physical or medical evidence to corroborate R.L.'s testimony. He notes that none of the state's witnesses (H.G., J.S., or T.S.) remembered whether R.L.'s white pants or pink top were soiled despite her being allegedly raped in a trashy storage room. Kovac notes that R.L. waited three years to reveal the alleged rape and her mother admitted to the treating physician that R.L. had been lying and sneaking around after the alleged incident. Kovac notes that Shane Burns was not a credible witness because he was obviously given a sentencing concession for his testimony. Also he notes that his wife noted no change in R.L.'s behavior or attitude toward her husband after the alleged rape.

{¶ 68} A weight-of-the-evidence argument concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. The manifest weight of the evidence "indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them." Id. A reviewing court, therefore, when evaluating the merits of a manifest-weight-of-the-evidence argument, must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the

694

evidence weighs heavily against the conviction." Id. at 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 69} Although a weight-of-the-evidence argument permits a reviewing court to consider the credibility of witnesses, that review must nevertheless be tempered by the principle that weight and credibility questions are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 70} This standard for reviewing a manifest-weight argument allows a court to "judge the credibility of opposing opinion testimony but not of fact testimony, unless it is so incredible that it defies belief." *Fairborn v. Boles* (May 15, 1998), Greene App. No. 97–CA–110, 1998 WL 241823. Consequently, a reviewing court should not substitute its judgment for that of the trier of fact's on the issue of credibility "unless it is *patently apparent* that the factfinder lost its way" in arriving at its verdict. (Emphasis added.) *State v. Bradley* (Oct. 24, 1997), Champaign App. No. 97–CA–03, 1997 WL 691510.

{¶ 71} After careful examination of the record, we cannot say that the judgment of the trial court is against the manifest weight of the evidence. R.L. testified that she was raped by the defendant. H.G. remembered that the defendant invited them into the storage room to see something in the late summer of 1997. R.L. made a fresh report of the rape to J.S., who remembered the incident. R.L.'s mother remembered R.L. showing her the blood on her clothing and thought it odd that her daughter's menstruation would start at such a young age. The lack of medical evidence to corroborate R.L.'s accusation was explained by Dr. Ralph Hicks. The jury was in the best position to evaluate the credibility of all the witnesses. The jurors do not appear to have lost their way. The third assignment of error is overruled.

{¶ 72} The judgment of the trial court is reversed, and the cause is remanded for a new trial.

Judgment reversed
and cause remanded.

GRADY, J., concurs.

FREDERICK N. YOUNG, J., dissents.

FREDERICK N. YOUNG, J., dissenting.

{¶ 73} I must respectfully dissent.

{¶ 74}   While I agree with the majority that the testimony by R.L.'s mother that her daughter was telling the truth about the rape was a clear violation of the rule enunciated in *State v. Boston,* and that the testimony was not invited error, I find the corroborating testimony by others, particularly that of J.S., H.G., and, indeed, the alleged victim's mother, as recounted in the majority opinion at ¶ 7–24, sufficient, if believed by a jury, as it obviously was, to render the mother's testimony as the veracity of her child harmless beyond a reasonable doubt.   A jury can readily discount a mother's testimony shielding her daughter much more easily than a physician's testimony as to the veracity of the alleged rape victim, which was the case in *Boston.*

{¶ 75}   Indeed, the majority actually finds that the verdict here was not against the manifest weight of the evidence, and for the same reasons cited by the majority for that finding at the end of its opinion, I find that the *Boston* error was harmless beyond a reasonable doubt.

{¶ 76}   I would affirm.