[Cite as *State v. Kennedy*, 2022-Ohio-3369.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

           Plaintiff-Appellee,

- v -

JENNIFER CAMILLE KENNEDY,

           Defendant-Appellant.

CASE NO. 2021-A-0030

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2021 CR 00187

**O P I N I O N**

Decided: September 26, 2022
Judgment: Reversed; remanded

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and *Shelley M. Pratt*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Robert N. Farinacci*, 65 North Lake Street, Madison, OH 44057 (For Defendant-Appellant).

THOMAS R. WRIGHT, P.J.

{¶1} Appellant, Jennifer Camille Kennedy, appeals the sentencing entry issued following a jury trial through which she was found guilty of one count of patient abuse. We reverse and remand.

{¶2} In 2021, the Ashtabula County Grand Jury indicted Kennedy on one count of patient abuse, a fourth-degree felony, in violation of R.C. 2903.34(A)(1) and 2903.34(C). The charge stemmed from an allegation that Kennedy struck a resident of a care facility where Kennedy was employed.

{¶3} Kennedy pleaded not guilty, and the matter proceeded to jury trial. At trial, the state presented the testimony of Kennedy's former coworkers; the facility's director of nursing, assistant director of nursing, and administrator; and a special agent for the Ohio Attorney General's Office. A summary of the elicited testimony follows.

{¶4} One of Kennedy's former coworkers, Skylar Darby, testified that she is a state tested nurse aide ("STNA") and was employed at the facility for approximately one month prior to the incident. On the morning of October 28, 2019, at the end of her overnight shift, Darby was dressing an elderly female resident ("the patient") who suffers from dementia and had been in a combative mood. As the shifts were changing at approximately 6:30 a.m., Kennedy requested a walkie-talkie to use to begin work. Darby told her that she was in the patient's room finishing her shift, and Kennedy could come assist her with the patient and then take Darby's walkie-talkie. When Kennedy arrived in the room, the patient again became agitated. When Kennedy and Darby attempted to stand the patient, she resisted by sitting back down, and she did not want to be touched. At some point, Kennedy and Darby were able to stand the patient up long enough to finish dressing her and transfer her to a chair. After sitting the patient down, the patient spit in Kennedy's face. Kennedy immediately backhanded the patient across the cheek and mouth area. The patient called Kennedy a "f***ing b*tch," and Kennedy responded, "that's f***ing nasty." The patient then spit on Kennedy a second time, and Kennedy again backhanded her across the cheek and mouth area and said, "[Y]ou don't spit in people's faces." After they left the room, Darby reported the incident to another coworker, Courtney Coffman, and then to the director of nursing and facility administration. On

2

cross-examination, Darby indicated that the slaps were hard enough to leave a red mark on the patient's face, but not so hard as to force the patient's head to turn.

{¶5}   Coffman testified that she is also an STNA and was working the same shift as Darby on the morning at issue.   At about 7:00 that morning, Coffman saw Darby in the hallway of the facility, and Darby was visibly upset.  Darby told Coffman what she had observed, and Coffman informed her to report the incident to the director of nursing, Gina Gruey.  Darby called Gruey, and Coffman observed that while Darby was speaking, her voice was shaky, and she appeared pale.

{¶6}   Gruey, a registered nurse, testified that when Darby called her, she sounded distraught.  Gruey directed Darby to return to the building and report the incident to the charge nurse.   Gruey characterized the patient's dementia as severe with behavioral disturbances.   She maintained that she had interacted with the patient on numerous occasions, and the patient demonstrated an inability to recollect events.   On cross-examination, Gruey indicated that she saw the patient on the morning at issue at approximately 8:00 or 8:30, and she did not see any bruising, redness, or swelling on the patient's face.

{¶7}   The assistant director of nursing, Katelyn Hosler, a trained wound care nurse, testified that when she arrived at the facility between 8:00 and 8:20 on the morning at issue, she was informed of the incident and conducted a skin assessment on the patient for wounds.   Hosler did not observe any injury to the patient.   On cross-examination, Hosler indicated that the staff continued to check on the patient for signs of injury on the date of the incident and the day after; however, no surface signs of injury developed.

3

{¶8} The administrator of the facility, Arkadiy Koltsov, testified that Darby was upset when reporting the incident to him. After speaking with Kennedy, a decision was made to terminate her employment. Koltsov indicated that the patient had a history of violent behaviors and had been diagnosed with dementia, persistent aggressive disorder, and depressive disorder. On cross-examination, Koltsov stated that he observed the patient at approximately 8:15 on the morning at issue, and he did not see any signs of injury to the patient.

{¶9} Debra Gearhiser, a special agent for the Ohio Attorney General's Office, testified that she investigates allegations of patient abuse. Here, Gearhiser affirmed that after her investigation, she compiled a referral for prosecution. On cross-examination, Gearhiser affirmed that she had not seen any pictures of injuries to the patient or any indication that the patient had complained of pain or discomfort.

{¶10} On behalf of the defense, Kennedy and Nicole Allen, her former coworker, testified. Kennedy testified that she has been an STNA for over 15 years, and she worked at the facility at issue for over six years. On the morning at issue, Kennedy clocked in for work at 6:30. The facility was short on walkie-talkies that morning, and Kennedy used another nurse's walkie-talkie to ask the third shift nurses for one she could borrow for the day. Darby informed Kennedy that she could use hers and to come to the patient's room to retrieve it. Kennedy had provided care to the patient many times, as she was often assigned to the patient's floor. When Kennedy arrived at the room, Darby had the patient fully dressed from the waist up and had a brief and pants around the patient's ankles ready to be pulled up. Kennedy then assisted Darby in finishing the patient's care, and the patient became agitated, which was typical for this patient, who did not like to be

4

touched. After they sat the patient back down, the patient began smacking with her hands, and Kennedy took the patient's hands and held them in the patient's lap. At that point, the patient twice spit on Kennedy. After the first time, Kennedy told the victim that "was f***ing nasty," but she did not physically react to the patient. The patient then began calling her names and said she was going to spit on Kennedy again. Kennedy put one hand in front of her face, but she did not extend her hand out or come into contact with the patient with her hand. After the patient spit on her the second time, Kennedy left the room, cleaned the spit off of her glasses, and began her shift. Less than a half-hour later, Kennedy received a call to come to the nurse's station. When she did, she was instructed to immediately leave the facility. Kennedy became upset when she learned of the allegations against her. Kennedy testified that she did not strike the patient either purposefully or by mistake. Kennedy further testified that an incident occurred prior to the incident at issue where Darby had neglected a patient, and Kennedy was blamed for that incident.

{¶11} On cross-examination, Kennedy identified a written statement that she had made on the day of the incident at issue. In the statement, Kennedy acknowledged that she had written that both she and the patient were wailing their arms. On redirect, Kennedy maintained that she was frustrated and upset when she wrote the statement, and she had only about five minutes available to write the statement.

{¶12} Allen testified that she is an STNA that worked with Kennedy nearly every day. Allen maintained that Kennedy was "one of the best" at the facility. On cross-examination, Allen affirmed that she did not have any knowledge regarding the incident at issue until Kennedy's attorney informed her of the charges against her.

5

Case No. 2021-A-0030

{¶13} The jury found Kennedy guilty on the sole count, and the trial court set the matter for sentencing. At sentencing, the court imposed five years of community control and sixty days of confinement.

{¶14} In her three assigned errors, Kennedy argues:

{¶15} "[1.] The Trial Court committed reversible error by permitting lay witnesses to provide their opinions as to the Defendant's guilt or innocence to the Jury and by allowing extensive testimony by each to support the validity of their ultimate conclusions of guilt."

{¶16} "[2.] The Trial Court committed prejudicial error by permitting the introduction of witness testimony that was hearsay, irrelevant, prohibitively prejudicial or the product of leading questions the volume of which were so pervasive as to deprive the Defendant of a fair trial."

{¶17} "[3.] The Trial Court erred to the prejudice of the Defendant in permitting lay witnesses to offer opinion testimony, as if testifying as an Expert, on a central issue of guilt or innocence. R.Evid. 16(K)."

{¶18} We first note that several of the challenges that Kennedy raises in her three assigned errors pertain to admission of specific portions of testimony and leading questions by the state to which defense counsel did not object. Accordingly, to that extent, Kennedy's arguments were forfeited for purposes of appeal, save for plain error review. *See State v. Fecko*, 11th Dist. Trumbull No. 2021-T-0021, 2022-Ohio-1277, ¶ 36. However, as we find admission of certain testimony to which objections were raised constitutes reversible error, we need not address the remaining challenges, whether or not forfeited, as they are rendered moot. *See* App.R. 12(A)(1)(c).

6

**{¶19}** In her first assigned error, Kennedy maintains that the state's witnesses impermissibly provided opinion testimony as to Kennedy's guilt and Darby's veracity.

**{¶20}** Pursuant to the Rules of Evidence, relevant evidence is generally admissible, and irrelevant evidence is inadmissible. Evid.R. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401. Pursuant to Evid.R. 701, "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." However, "''it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses.'''" *State v. Alex*, 11th Dist. Ashtabula No. 2016-A-0055, 2017-Ohio-8527, ¶ 25, quoting *State v. Boston*, 46 Ohio St.3d 108, 129, 545 N.E.2d 1220 (1989), *overruled, in part, on other grounds* by *State v. Dever*, 64 Ohio St.3d 401, 596 N.E.2d 436 (1992), quoting *State v. Eastham*, 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (1988) (Brown, J., concurring). Accordingly, witnesses are not permitted to offer opinions on the truthfulness of other witnesses. *State v. Bowden*, 11th Dist. Ashtabula No. 2013-A-0040, 2014-Ohio-158, ¶ 43, citing *State v. Bajaj*, 7th Dist. Columbiana No. 03CO 16, 2005-Ohio-2931, ¶ 72 and *State v. Kovac*, 150 Ohio App.3d 676, 2002-Ohio-6784, 782 N.E.2d 1185, ¶ 43 (2d Dist.). "The state elicits such opinion evidence at its peril, particularly where the evidence essentially involves a credibility contest and significant independent evidence of the

7

offenses * * * is lacking." *State v. Miller*, 2d Dist. Montgomery No. 18102, 2001 WL 62793, *7 (June 26, 2001).

{¶21} As indicated in our summary of the testimony, the trial focused primarily on the credibility of Darby and Kennedy as to their accounts of the incident. The parties agree that the patient was unable to competently relay information regarding the incident due to her conditions. It is further undisputed that no physical evidence of injury to the patient was discovered aside from Darby's testimony that the slaps left a red mark on the patient's face.

{¶22} At the end of the direct examination of Gruey, the state questioned her as follows:

> Q. And based on all the knowledge that you have, did you have any reason not to believe Ms. Darby?
>
> MR. LOFTUS: Objection.
>
> THE COURT: One moment. Overruled.
>
> BY [THE STATE]:
>
> Q. You can answer.
>
> A. Can you repeat the question?
>
> Q. Absolutely. With all of the knowledge that you have, did you have any reason not to believe Ms. Darby?
>
> A. No.

{¶23} On redirect examination of Gruey, the following exchange occurred:

> Q. Ms. Gruey, were you part of the decision process to let Ms. Kennedy go?
>
> A. Yes.

8

Case No. 2021-A-0030

> Q. And knowing all that you know about that incident, the one we're here for today, are you comfortable with that decision?
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> BY [THE STATE]:
>
> Q. You can answer.
>
> A. Yes.

{¶24} These questions impermissibly infringed upon the province of the jury to determine the truthfulness of witnesses and were therefore improper. *See State v. Lentz*, 6th Dist. Erie No. E-91-58, 1993 WL 241679, *7 (June 30, 1993) (if objection had been raised to question of whether witness had reason to believe officers were lying, then the testimony would not have been admissible); *Miller*, 2001 WL 62793, at *6 ("police officers' testimonies * * * were in direct violation of *Boston* because they offered an opinion as to the truth of [victim's] accusations").

{¶25} Further, Kennedy challenges portions of Gearhiser's testimony. After Gearhiser testified as to her role in investigating crimes against nursing home residents as an agent in the patient and abuse section of the Ohio Attorney General's Office, the following exchange occurred:

> Q. And approximately, your best guess, in a given year, how many cases come into your office?
>
> A. Well, this case occurred in 2019, and during that year, um – well, in general, on an annual basis we probably get a thousand complaints in general to our office; at least a thousand complaints.
>
> Q. And in 2019, do you know how many specific abuse and neglect complaints you received?

9

A. Abuse and neglect complaints, we received approximately 224 or 225 complaints.

Q. And of those 225ish, how many were actually opened and investigated?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. Approximately 114.

Q. And of that 114, how many got to the stage of referring for prosecution?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A. 14 for that particular year.

Q. And this would be one of them?

A. Yes.

{¶26} Assuming, without deciding, that the investigative methods and procedures that Gearhiser employed in this case were relevant, we cannot discern a proper relevant purpose for the testimony regarding the particular numbers of cases winnowing from those reported to the Attorney General's Office, to those investigated, and then to those referred for prosecution. *See* Evid.R. 401. The only basis that this court can discern for evidence of the rarity with which the Attorney General's Office refers these complaints for prosecution is to improperly bolster Darby's credibility through statistics that did not pertain to a fact at issue in this case. Accordingly, the trial court erroneously overruled Kennedy's objections to this testimony.

10

**{¶27}** However, having concluded that the trial court erroneous overruled defense counsel's objections to the questions posed to Gruey and Gearhiser does not end our inquiry, as we must further determine whether admission of this testimony was harmless.

> Crim.R. 52(A) defines harmless error in the context of criminal cases and provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." During a harmless-error inquiry, the state has the burden of proving that the error did not affect the substantial rights of the defendant. *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15. Furthermore, if there is "a '[d]eviation from a legal rule,'" courts undertake a "'harmless error' inquiry—to determine whether the error 'affect[ed] substantial rights' of the criminal defendant." *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7, quoting *United States v. Olano*, 507 U.S. 725, 732–733, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The term "substantial rights" has been interpreted to require that "'the error must have been prejudicial.' (Emphasis added.)" *Id.*, quoting *Olano* at 734 * * *[.] If a court determines that the error did not affect the defendant's substantial rights, then the error is harmless and "'shall be discarded.'" *Id.*, quoting Crim.R. 52(A).

*State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23. In *Morris*, the Supreme Court of Ohio identified three steps in determining whether an error is harmless pursuant to Crim.R. 52(A). "First, there must be prejudice to the defendant as a result of the admission of the improper evidence at trial." *Id.* at ¶ 27. "Second, an appellate court must declare a belief that the error was not harmless beyond a reasonable doubt." (Citations omitted.) *Id.* at ¶ 28. "Third, in determining whether a new trial is required or the error is harmless beyond a reasonable doubt, the court must excise the improper evidence from the record and then look to the remaining evidence." *Id.* at ¶ 29. "'"[T]he cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to

11

the conviction.'"" *Id.*, quoting *State v. Rahman*, 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986), quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166, 450 N.E.2d 265 (1983), fn. 5. When reviewing the remaining evidence, the reviewing court's role "'is not to sit as the supreme trier of fact, but rather to assess the impact of this erroneously admitted testimony on the jury.'" *Morris* at ¶ 29, quoting *Rahman* at 151, fn. 4.

{¶28} Here, Gruey's statements that she had no reason to disbelieve Darby and that she was comfortable with the decision to terminate Kennedy's employment were prejudicial to Kennedy, as the statements of Darby and Kennedy were inconsistent on the central issue of whether Kennedy slapped the patient. Further, Gruey was in a position of authority at the care facility that employed both Darby and Kennedy, allowing an inference that her position and familiarity with these individuals provided her with superior assessment of their veracity. Although we cannot say that the outcome would have necessarily been different if not for Gruey's and Gearhiser's challenged testimony, this is not a case where there was overwhelming evidence of guilt or other indicia that the challenged testimony did not contribute to the conviction, as the primary issue pertained to the credibility of Darby and Kennedy. Accordingly, admission of the testimony was not harmless beyond a reasonable doubt, and Kennedy's conviction must be reversed on this issue alone. Consequently, to this extent, Kennedy's first assigned error has merit.

{¶29} Having found reversible error regarding this aspect of Kennedy's first assigned error, we do not further address the remaining challenges presented on appeal, as they have been rendered moot.

12

{¶30} The judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion.

CYNTHIA WESTCOTT RICE, J.,

MATT LYNCH, J.,

concur.

13