[Cite as *State v. Pawlak*, 2014-Ohio-2175.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No.   99555

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JAMES L. PAWLAK

DEFENDANT-APPELLANT

---

## JUDGMENT:
REVERSED AND REMANDED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No.   CR-11-557638-A

**BEFORE:**   Keough, J., Celebrezze, P.J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** May 22, 2014

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1350 Standard Building
1370 Ontario Street
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
By: Andrew Rogalski
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

KATHLEEN ANN KEOUGH, J.:

{¶1} Defendant-appellant, James L. Pawlak, appeals his judgment of conviction entered after a jury trial. After a thorough and careful review of the record, we reverse and remand for a new trial.

{¶2} In 2011, the Cuyahoga County Grand Jury returned a 26-count indictment against Pawlak for sexual offenses committed against five children, including 16 counts of gross sexual imposition and 10 counts of kidnapping. The kidnapping counts contained either a sexually-violent-predator specification or a sexual-motivation specification. The matter proceeded to trial where the jury heard the following evidence.

I. Trial

{¶3} Pawlak and P.B. were involved in a relationship for over five years, although they knew each other since each was ten years old. P.B. has two daughters, victim 2 and victim 3, who lived with her and Pawlak. Victim 2 has a half-sister, victim 1, whose mother is S.G. P.B.'s close friend, C.H., has two daughters, victim 4 and victim 5. All the girls would often play with each other at P.B. and Pawlak's home — first when they lived on Carlyle Avenue and then when they moved to Spokane Avenue in the fall of 2010.

{¶4} On December 13, 2011, Deena Davis, a social worker in the sex abuse department of Cuyahoga County Children and Family Services ("CCDCFS"), received a referral regarding victim 2 alleging that Pawlak was the perpetrator. The allegation was that children were being sexually abused by Pawlak, who resided in the children's home.

Davis contacted P.B. requesting that she bring all three of her children, including victims 2 and 3, to the agency. P.B. arrived at the agency with her children and her friend, C.H. Davis testified that she interviewed each child separately and each denied the allegation. Based on the information given, she determined that the children were safe, but that a home visit was necessary to complete the investigation. She scheduled a home visit with P.B.

{¶5} The following day, December 14, 2011, Cleveland police officer Theresa Cavett was working second shift at the Second District when she received an assignment to interview a victim of sexual assault who was waiting in the lobby. The victim was victim 1, accompanied by her mother and father. Cavett testified that she interviewed victim 1 with her mother present. During the interview, victim 1 told Cavett about an incident in 2010 involving Pawlak, and reported that other juveniles were also involved. Cavett testified that based on this information, she called P.B. and C.H., the mothers of the girls who were identified as the other victims.

{¶6} Cavett testified that she interviewed each of the victims, except victim 3, in the presence of their mothers. During the course of each interview, Cavett learned that each victim had been inappropriately touched by Pawlak and that all of the incidents occurred in P.B.'s house on Spokane Avenue. None of the victims mentioned any inappropriate activity at the Carlyle address. She further learned that the incidents occurred between 2010 and the two weeks prior to these interviews. Cavett stated that Pawlak turned himself in later that evening, although she did not speak with him.

**{¶7}** Davis testified that on December 15, 2011, CCDCFS sex abuse department received another call alleging additional claims of sexual abuse by Pawlak, not only regarding victims 2 and 3, but also victims 1, 4, and 5. Davis contacted the mothers of the victims and requested they bring their children to the agency for interviewing.

**{¶8}** During these interviews, both Davis and Cleveland police detective James Butler were present. They first interviewed victim 2, who disclosed that Pawlak touched her breasts and vaginal area, with the first incident being on Carlyle. Davis testified that when victim 2 was questioned about previously denying the allegations, victim 2 stated she was scared and did not want to upset her mom.

**{¶9}** Victim 3 was interviewed next. During this interview, victim 3 disclosed that Pawlak carried her downstairs and touched her vaginal area.

**{¶10}** Victim 4, victim 5, and victim 1 were interviewed together. Victim 4 disclosed to Davis that once at P.B.'s house, she fell off the railing of the bed, and Pawlak "grabbed her and simulated a humping action."

**{¶11}** Victim 5 told Davis about a time when the kids were playing hide-and-seek and she was hidden in the bunk bed. When Pawlak found her, he grabbed her face and put it in front of his private parts. Victim 5 told Davis that she pushed Pawlak away.

**{¶12}** Victim 1 told Davis about an incident that occurred at P.B.'s house where Pawlak got into bed with her and was "rubbing on top of her clothing and underneath her clothing and trying to hump her."

{¶13} During the course of her investigation, Davis learned that victim 2 had recanted her story after victim 2's aunt told her that Pawlak had passed a lie detector test. She also learned from Pawlak that he knew why the girls were making the allegations. When Davis interviewed S.G., she learned that P.B. and C.H. believed victim 2's father put the idea of sexual abuse into the children's minds. According to Davis, S.G. believed the girls because she thought the girls never talked about the incidents among themselves, but Davis learned that the girls talked about their experiences with each other at some point — each girl telling Davis a different version of who was present when they were talking about it. For instance, victim 4 told Davis that everyone except victim 2 was sharing their stories. Yet victim 1 stated that they all were telling their stories except victim 4.

{¶14} Each victim also testified at trial.

Victim 1

{¶15} Regarding victim 1, the indictment charged Pawlak with five counts of gross sexual imposition (Counts 1 through 5), one count of kidnapping with a sexual-motivation specification (Count 6), and one count of kidnapping with an allegation of serious physical harm (Count 7).

{¶16} Victim 1, age 14 at trial, testified that Pawlak did "something wrong" to her about a year or two ago at the Carlyle house. She testified that Pawlak made her "uncomfortable" because he was "rubbing" on her, in her "private area"— her "vagina." She stated that on one occasion she, Pawlak, P.B., and victim 2 were in victim 2's room,

lying on the bed, when Pawlak "kind of put his arm around me and was touching." She stated that it felt like she could not leave, and that Pawlak called her "P.B." According to victim 1, she woke victim 2, and they both went into the bathroom where victim 1 told victim 2 what had happened. Victim 2, however, testified that she did not find out that victim 1 was touched by Pawlak until she went to the police station. Victim 2 further testified that victim 1 subsequently reminded her that she woke her up, but victim 2 could not remember if she did.

{¶17} Victim 1 further testified that sometimes Pawlak would pull her close to his body — his "private area," which made her feel uncomfortable. She stated he also tickled her on the thigh near her private area; "a few times maybe once or twice, three times, I'm not sure."

{¶18} Victim 1 admitted that she did not tell anyone about this incident for over a year because she did not want to believe what had happened to her. In fact, she stated that when she was first asked by her mother about any inappropriate activity involving Pawlak, victim 1 denied that anything had happened. Only after she found out that the other girls had said something did she decide to tell her mother what had happened.

{¶19} Pawlak would ultimately be found guilty of Count 4 relative to victim 1, which alleged that Pawlak rubbed her vagina in the bedroom at the Carlyle address. All other counts pertaining to victim 1 were either dismissed or Pawlak was found not guilty.

Victim 2

{¶20} Regarding victim 2, the indictment charged Pawlak with four counts of gross sexual imposition (Counts 8 through 11), one count of kidnapping with a sexual-motivation specification (Count 12), and one count of kidnapping with an allegation of serious physical harm (Count 13).

{¶21} Victim 2, age 12 at trial, testified that when she was in the fourth grade and living on Carlyle, Pawlak touched her inappropriately while they were watching a movie. She stated that Pawlak got under the covers of her bed and touched her on top of her clothing "in her private area" — her "vagina." She stated that he "went in circles." She stated that she told him to "stop" and to "leave." According to victim 2, Pawlak said "fine" and left. Victim 2 did not tell anyone that this happened.

{¶22} Victim 2 stated that Pawlak touched her again while she was still living on Carlyle and in the fourth grade. She stated that she asked Pawlak to lie at the bottom of her bed because she heard noises in the attic and was afraid. She testified that she pretended to be asleep to see if Pawlak would touch her again. According to victim 2, Pawlak again got under the covers, touched her "private part," on top of her underwear, and again "going in circles." She stated she punched Pawlak and told him to "get out." Again, according to victim 2, Pawlak said "fine" and left.

{¶23} She stated that when she first talked with the social worker while her mom was present, she denied the allegations because she did not want to hurt her mom. She said the first person she told about Pawlak touching her was her step-mom (S.G.) who then took her to the police station. However, after her Aunt Peggy told her that Pawlak

was maintaining his innocence, she told her mom she was lying about the allegations. She admitted that when she told her mom she was lying, her mom was "happy." At trial, victim 2 stated she was testifying truthfully.

{¶24} Pawlak would ultimately be found guilty of Count 8 relative to victim 2, which alleged that Pawlak had touched victim 2's vagina in her bedroom on Carlyle. The remaining counts pertaining to victim 2 were either dismissed or Pawlak was acquitted of the charges.

Victim 3

{¶25} Regarding victim 3, the indictment charged Pawlak with three counts of gross sexual imposition (Counts 14 through 16), one count of kidnapping with a sexual-motivation specification (Count 17), and one count of kidnapping with an allegation of serious physical harm (Count 18).

{¶26} Victim 3, almost age 11 at trial, stated that she was in court because Pawlak "touched us." She initially testified that Pawlak touched her, but that she did not remember when or where she was in the house. She stated that Pawlak touched her in the "wrong spot" with "his fingers in her vagina on top of her clothes." After some prompting by the prosecutor, victim 3 remembered that she, her brother, victim 2, victim 4, victim 5, and Pawlak were playing hide-and-seek. She was hiding with victim 5 and Pawlak in her brother's bedroom closet. She recalled it was nighttime and the lights were off in the closet, although she could somewhat see because the closet door was "kind of open." She stated the girls were sitting on a bar, and Pawlak was standing up

and touched her for a couple of seconds, which made her feel uncomfortable. She told him to "stop." She stated that this was the only time Pawlak ever touched her. She testified, without objection, that victim 5 told her that Pawlak had also touched her, but victim 3 admitted that she did not see Pawlak touch victim 5. She admitted she did not tell anyone what happened, except her grandma, whom she told a couple days later. However, she later admitted that some time later, she, victim 2, victim 4, and victim 5 all talked about what happened. She denied that Pawlak carried her on his shoulders and touched her, and again stated the only time Pawlak touched her was in the closet on Spokane.

{¶27} Victim 3 then testified about talking with the social worker, police, and prosecutor. She admitted to lying to the prosecutor, social worker, and police that the allegations did not happen because she was "scared," but was "being truthful today." After being prompted, she stated that Pawlak used to carry her around like a baby, cradling her in his arms. When he did this, he would touch her vagina with his fingers. According to victim 3, she told him to "stop" and he apologized. She stated that this incident occurred prior to the closet incident when they were living on Carlyle.

{¶28} On cross-examination, victim 3 testified that she went over her testimony with the prosecutor previously. She stated that victim 5 was the first person she told about Pawlak touching her, then she stated that her friend was the first person she told. She admitted that when she spoke with the social worker, she denied that anyone touched her "butterfly," which she stated was her vagina. She further testified that she told the

social worker that if someone had touched her "butterfly," she would tell someone. At trial, she admitted that statement was not truthful. She further admitted that she and the other girls all talked about what happened, and a few days before going to the police, she and three of the other victims discussed it again.

{¶29} On redirect, victim 3 stated that Pawlak touched her on two separate occasions — once while living on Carlyle and once while living on Spokane. She stated that these incidents occurred three months apart. She again admitted she had been dishonest with the police when she spoke with them twice. However, she said she was being honest with the police when she told them about the "carrying" incident with Pawlak. She also admitted she was honest and dishonest with the social worker because she only told her part of the story.

{¶30} Pawlak was found guilty of Count 14 relative to victim 3, which alleged that he had touched victim 3's vagina. The remaining counts involving victim 3 were either dismissed or Pawlak was acquitted of the charges.

Victim 4

{¶31} Regarding victim 4, the indictment charged Pawlak with two counts of gross sexual imposition (Counts 19 and 20), and one count of kidnapping with a sexual-motivation specification (Count 21), and one count of kidnapping with an allegation of serious physical harm (Count 22).

{¶32} Victim 4, age 10 at trial, testified that she was in court "[b]ecause of some things happening like people touching on other people, and it's not appropriate." When

prompted, she stated that Pawlak did "something bad" to her two or three times when she was ten-years-old while at Aunt P.B.'s house on Spokane in August 2011.

**{¶33}** Victim 4 said the first incident happened when Pawlak was wrestling with her. She stated she did not like how he would wrestle with her because he would touch areas that should not be touched. She stated that while she, victim 2, victim 3, victim 5, and her brother were wrestling in her brother's room, Pawlak came in and was "lifting us up by the inappropriate areas," i.e. her vagina. She stated that he also touched her butt. She felt like Pawlak's touching was something more than accidental, "like he purposely put his hand there." She stated this happened one time.

**{¶34}** The following day, but during the same visit, she and victim 5 were playing. As the two of them were wrestling, victim 5 pushed victim 4 down and she fell on top of Pawlak, who then "pushed her up and down on his wiener" for a couple of seconds. Afterwards, she and victim 5 went into another room and talked about what had happened. They told victim 2 and victim 3 what happened, and weeks later told victim 4's grandmother, who told P.B., who then told victim 4's mother. Victim 4 testified that when her mother questioned her, she denied that Pawlak had touched her because she was scared.

**{¶35}** She admitted that she and the other girls discussed these incidents among each other before going to the police station. She further testified that she saw Pawlak grab victim 5 by the hips and "move her up and down on his weener while standing up." She also testified that she saw him put victim 5's head by his "weener."

{¶36} Pawlak was found guilty of Count 20, relative to victim 4, which alleged that Pawlak had "humped" her vagina. The remaining counts involving victim 4 were either dismissed or Pawlak was acquitted of the charges.

Victim 5

{¶37} Regarding victim 5, the indictment charged Pawlak with two counts of gross sexual imposition (Counts 23 and 24), and one count of kidnapping with a sexual-motivation specification (Count 25) and one count of kidnapping with an allegation of serious physical harm (Count 26).

{¶38} Victim 5, age 13 at trial, testified that one time when she and the other kids were playing, Pawlak made her face "go into his private parts" by grabbing her by the back of the head. She stated this happened a couple of times. She also testified that on one occasion, Pawlak was lying on the back of the bed and grabbed her by the hips and made her go "up and down on him." She stated that she fell over the railing of the bed, falling next to Pawlak. He then grabbed her, and placed her on top of him, so she was sitting on her knees. According to victim 5, Pawlak moved her up and down on top of him, and she could feel his "private parts." She testified that this "humping" action occurred three or four times at the Spokane address.

{¶39} After prompting by the prosecutor, victim 5 then described an incident where she was playing hide-and-seek and while she and Pawlak were hiding in the closet, Pawlak touched her vagina on top of her clothing. She stated she pushed his hand away saying "no."

**{¶40}** She stated she told victim 2, victim 3, and victim 4 about what had happened. According to victim 5, they all told each other what Pawlak had done to them.

**{¶41}** Pawlak was found guilty of both counts of gross sexual imposition and Count 25, kidnapping with a sexual-motivation specification. He was acquitted of the other kidnapping charge.

P.B.

**{¶42}** P.B., mother of victims 2 and 3 and girlfriend of Pawlak, testified that when she first took her children to CCDCFS, her daughters denied any allegations of sex abuse. She stated that after the first interview with CCDCFS, victim 2 had telephone contact with her father. The following day, S.G. took victim 2 to the police station regarding the allegations against Pawlak.

**{¶43}** P.B. stated that victim 2's father called her and told her to bring victim 3 to the police station. However, she testified that victim 3 never told her that the allegations were true, until "yesterday." She stated that she never noticed any changes in behavior or attitude between Pawlak and her daughters, and that none of the girls or their mothers ever approached her about any inappropriate behavior by Pawlak.

**{¶44}** On direct examination, she admitted that she did not break up with Pawlak after the allegations surfaced because "she did not know what to believe." On cross-examination, she further admitted that she really did not know what happened.

S.G.

**{¶45}** S.G., the mother of victim 1 and step-mother of victim 2, testified that in late 2009 or early 2010, she "heard" that Pawlak had touched victim 3. S.G. said she started questioning people, and when P.B. found out S.G. was asking questions, P.B. called her and told her it was a "lie." When she asked victim 1 about it, her daughter started crying and denied that anything had happened. Although both P.B. and victim 1 denied the allegations, victim 1 was not allowed to go over to P.B.'s house anymore.

**{¶46}** In 2011, S.G. again heard rumors about Pawlak. When she heard the rumors again, S.G.'s sister was there, who asked victim 1 about the allegations. After speaking with victim 1, S.G.'s sister told S.G. that victim 1 was crying and that something had happened. This time when S.G. asked victim 1, she told her mom that Pawlak always liked to play with them and one night when P.B. and Pawlak were living on Carlyle, he came into victim 2's room and put his hand under her shorts touching her. S.G. immediately took her to the police station.

**{¶47}** S.G. called C.H. to tell her that she was at the police station with victim 1. C.H. responded that she was on her way because her "kids told me that [Pawlak] touched them." S.G. testified that she lied to P.B. in order to pick up victim 2 to bring her with them to the police station. When victim 2 got in the car, S.G. told her that victim 1 had disclosed that Pawlak touched her and if victim 2 wanted to, she could talk to the police officer.

**{¶48}** S.G. testified that in the days that followed, different stories started emerging, and some of the girls and mothers were saying that the allegations were a lie.

**{¶49}** Following the close of the state's case, the state dismissed Counts 2, 9, and 11. The trial court granted Pawlak's Crim.R. 29 motion for judgment of acquittal on Counts 1, 3, 5, and 16.

**{¶50}** In his defense, Pawlak called two witness — C.H. and Detective Butler. C.H., the mother of victims 4 and 5, testified that she had a conversation with Pawlak's father, who questioned her about her knowledge of the allegations. C.H. testified that the information she shared with Pawlak's father was not the same she shared with the police or social worker. Detective Butler testified that there was no physical evidence in this case.

**{¶51}** After the defense presented its case, the trial court denied Pawlak's renewed Crim.R. 29 motion, and the matter was submitted to the jury on the remaining 19 counts.

**{¶52}** While the jury deliberated, Pawlak moved for a mistrial based on the state's alleged non-disclosure of exculpatory evidence that victim 5 had made similar allegations regarding inappropriate activity against others, including a family member. The trial court denied Pawlak's motion. The new information regarding victim 5's subsequent alleged accusations also formed the basis for Pawlak's motion for a new trial, which the trial court also denied.

**{¶53}** The jury returned guilty verdicts on six counts of gross sexual imposition — one count for each victim, except victim 5, where Pawlak was found guilty of two counts of gross sexual imposition. The jury also returned a guilty verdict for one count of kidnapping with a sexual-motivation specification also involving victim 5. The jury

found Pawlak not guilty of the remaining 12 counts. Subsequently, the court found Pawlak not guilty of the sexually-violent-predator specifications.

**{¶54}** Pawlak was sentenced to prison for three years on each of the gross sexual imposition charges and to life in prison with a possibility of parole after ten years on the kidnapping charge; all sentences were ordered to run concurrently.

**{¶55}** Pawlak appeals his convictions, raising four assignments of error.

### I. Sufficiency of the Evidence

**{¶56}** In his first assignment of error, Pawlak contends that his conviction for kidnapping was not supported by sufficient evidence.

**{¶57}** The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

**{¶58}** In Count 25, Pawlak was charged with kidnapping in violation of R.C. 2905.01(A)(4), which provides that

> [n]o person, by force, threat, or deception, or in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove

another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * * to engage in sexual activity * * *.

{¶59} Pawlak argues that there was no allegation that he removed victim 5 from the place were she was found; thus the only basis for the kidnapping conviction would be if he restrained her of her liberty, which, according to Pawlak, the evidence was insufficient to prove. We disagree.

{¶60} This court has previously defined the element of "restrain the liberty of the other person" to mean "to limit one's freedom of movement in any fashion for any period of time." *State v. Wright*, 8th Dist. Cuyahoga No. 92344, 2009-Ohio-5229, ¶ 23-24, quoting *State v. Wingfield*, 8th Dist. Cuyahoga No. 69229, 1996 Ohio App. LEXIS 867 (Mar. 7, 1996). *See also State v. Walker*, 9th Dist. Medina No. 2750-M, 1998 Ohio App. LEXIS 4067 (Sept. 2, 1998) (restraint of liberty does not require prolonged detainment); *State v. Messineo*, 5th Dist. Athens Nos. 1488 and 1493, 1993 Ohio App. LEXIS 38 (Jan. 6, 1993) (grabbing victim's arm and shaking her constituted restraint).

{¶61} Ohio law is clear that

[a]n offense under R.C. 2905.01 does not depend on the manner in which an individual is restrained. * * * Rather, it depends on whether the restraint "is such as to place the victim in the offender's power and beyond immediate help, even though temporarily." * * * The restraint "need not be actual confinement, but may be merely compelling the victim to stay where [s]he is."

*State v. Mosley*, 178 Ohio App.3d 631, 2008-Ohio-5483, 899 N.E.2d 1021 (8th Dist.), quoting *State v. Wilson*, 10th Dist. Franklin No. 99AP-1259, 2000 Ohio App. LEXIS 5057 (Nov. 2, 2000).

**{¶62}** In this case, victim 5 testified that Pawlak on different days engaged in two separate acts with her. On one occasion, she fell over the bed railing and was lying next to Pawlak. He then "grabbed her, put her on top of him" so she was sitting on her knees, and he "moved [her] up and down" on top of him. According to victim 5, when this happened, she could feel his "private part" through his boxer shorts, which was "hard." Victim 5 testified that this activity happened "three or four times."

**{¶63}** The other incident occurred when Pawlak grabbed her by the back of her head and "made her face go into his private parts." She testified that "this" happened a couple of times. Victim 5 also testified that when these two incidents occurred, they only lasted for a "couple of minutes."

**{¶64}** While it is true that victim 5 testified that Pawlak did not prevent her from leaving the room and she felt that she could leave, viewing the evidence in the light most favorable to the prosecution, sufficient evidence was presented to support Pawlak's conviction of kidnapping. Pawlak grabbed victim 5 on multiple occasions by her hips, placed him on top of him, and engaged in sexual activity, which lasted a couple of minutes. Accordingly, the first assignment of error is overruled.

## II. Testimony of P.B.

**{¶65}** The testimony of P.B. was crucial to the state. P.B. was the mother of two of the victims and the girlfriend of the defendant, and the testimony of P.B. proved to be problematic from the start. She stated that she did not want to testify and that her "kids testified, so why should she have to?"

A. Effective Assistance of Counsel

{¶66} During the direct examination of P.B., the prosecutor elicited that P.B. had ended her relationship with Pawlak because she found out that Pawlak "had been cheating" on her. The following exchange then took place:

Q: You found out, you mean with these girls, or with other girls?

A: Other girls.

Q: And do you know who these girls are?

A: Yes.

Q: And do you know their ages?

A: Yes.

Q: And who were the other girls?

A: Friends of ours.

Q: What were their names and ages, please?

A: Sarah, she's 22, Brandi, 17, 18, um, Crystal was 17, 18.

Q: And?

A: Amber.

Q: How old was Amber?

A: Fifteen.

Q: Fifteen?

A: Yes.

Q: So it took him — did he admit that he cheated on you with these women, or these girls?

A: Yes.

Q: I'm sorry?

A: Yes.

Q: So it took him admitting that he had been with 15 to 17-year [-]olds before you broke up with him?

A: No.

**{¶67}** Defense counsel did not make any objection during this exchange; thus, Pawlak assigns as his second assignment of error that his counsel was ineffective for failing to object to this prejudicial testimony, request a curative instruction, or move for a mistrial. The state contends that the evidence was relevant and admissible under Evid.R. 404(B) and R.C. 2945.59, which allow for the admission of other acts evidence for the purpose of showing intent, motive, or lack of mistake or accident.

**{¶68}** To establish ineffective assistance of counsel, a defendant must show (1) that counsel's representation was deficient in that it "fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Sanders*, 94 Ohio St.3d 150, 151, 2002-Ohio-350, 761 N.E.2d 18, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 694.

**{¶69}** In evaluating a claim of ineffective assistance of counsel, a court must give great deference to counsel's performance. *Strickland* at 689. A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bradley* at 141.

**{¶70}** Accordingly, the first step in analyzing this assignment of error is to determine whether the testimony was inadmissible to warrant an objection.

**{¶71}** "'Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime or that he acted in conformity with bad character.'" *State v. Ceron*, 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5241, ¶ 67, quoting *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 15, citing *State v. Curry*, 43 Ohio St.2d 66, 68, 330 N.E.2d 720 (1975). However, certain exceptions exist to this common law rule. *See* R.C. 2945.59, Evid.R. 404(B).

**{¶72}** Evid.R. 404(B) provides that

Evidence of other crimes, wrong, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

**{¶73}** In determining whether to permit other-acts evidence to be admitted, trial courts should conduct a three-step analysis:

(1) determine if the other-acts evidence "is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence" under Evid.R. 401; (2) determine if the other acts "is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)"; and (3) consider "whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice."

*Ceron* at ¶ 70, citing *Williams* at ¶ 20.

**{¶74}** Notwithstanding the fact that the state did not afford Pawlak any notice of using "other acts" evidence, we find that the *Williams* test is not satisfied to render P.B.'s testimony admissible under Evid.R. 404(B).

**{¶75}** The first step of the *Williams* test is to determine if the other acts evidence "is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence" under Evid.R. 401. *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 20. As stated by Evid.R. 402, "[a]ll relevant evidence is admissible" and "[e]vidence which is not relevant is not admissible."

**{¶76}** Reviewing the challenged testimony, the names and ages of the girls Pawlak had an affair with was entirely irrelevant to the case. No testimony was given that Pawlak's interaction with any of these girls garnered any criminal charges. The testimony that Pawlak had a relationship with a 15-year-old girl was equally irrelevant to making it more or less probable that he inappropriately touched the victims in this case, who ranged from age 8 to 12 at the time of the incidents. Furthermore, the existence of

the minor girlfriends was never verified by the state. Accordingly, the first step in *Williams* is not satisfied.

**{¶77}** Moreover, we find that the second step of *Williams* is not met. In the second step of the *Williams* test, courts must determine if the other-acts evidence "is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)," including proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Williams*, at ¶ 20.

**{¶78}** The state contends that P.B.'s testimony that Pawlak cheated on her with a 15-year-old girl showed that Pawlak's sexual contact with the victims of this case was intentional, rather than accidental. The state contends this testimony was proper because it rebutted Pawlak's trial theory that any supposed sexual contact between him and the victims was accidental. Contrary to the state's assertion, the trial transcript reveals that Pawlak's defense at trial was that he did not engage in any inappropriate contact with the victims.

**{¶79}** The only plausible use of P.B.'s testimony was to draw an impermissible character inference that is forbidden by Evid.R. 404(B) — to show that Pawlak has an attraction to much younger women; thus, using this character trait to show that he acted in conformity therewith by engaging in sexual contact with these five minor girls. Accordingly, the second part of the *Williams* test fails.

**{¶80}** Because this testimony has no probative value, we need not address the final step under *Williams*. *See Ceron*, 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5241, ¶ 93-95.

**{¶81}** Finding that this testimony was improper Evid.R. 404(B) evidence and irrelevant, an objection to P.B.'s testimony would not have been futile and would likely have been sustained if made, because there would be no justification for its admission. Accordingly, we must next consider whether failing to object constituted ineffective assistance of counsel.

**{¶82}** Failing to object to irrelevant and prejudicial testimony may sometimes be viewed as tactical. "Failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988).

**{¶83}** The Ohio Supreme Court explained,

> "experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error *unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state*. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."

(Emphasis added.) *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir.2006).

**{¶84}** In this case, counsel's failure to object cannot reasonably be viewed as trial strategy or tactical choice. This was not a situation where a highly prejudicial, but single

off-hand statement was made. Objecting in that instance would just bring a heightened awareness to the testimony; thus, failing to object would be deemed tactical.

{¶85} However, in this case, once the series of questions began, defense counsel could have made an objection to the line of questioning before any unfair prejudicial testimony was presented. Moreover, we are further troubled that defense counsel did not object to the state's use of leading questions in eliciting this testimony. After P.B. did not identify all of the women Pawlak allegedly had indiscretions with to the satisfaction of the state, the prosecutor prompted P.B. by asking, "And?". P.B. then gave the name of another girl, who was later identified as being age 15. Defense counsel had multiple opportunities to curtail the introduction of this damaging and unfair prejudicial testimony. Defense counsel allowed the jury to hear that Pawlak admitted to engaging in activity with minors. There was absolutely no tactical reason to continue allowing the leading questions that evoked the irrelevant and prejudicial testimony.

{¶86} Pawlak contends that, in addition to not objecting to this testimony, trial counsel was also ineffective for failing to subsequently remedy counsel's error by requesting a curative instruction or mistrial.

{¶87} Counsel's decision not to request an instruction falls within the ambit of trial strategy, and debatable trial tactics do not constitute ineffective assistance of trial counsel. *See, e.g., State v. Lawson*, 64 Ohio St.3d 336, 341, 595 N.E.2d 902 (1992); *State v. Leonard*, 104 Ohio St. 3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 146. Pawlak does not mention what language the curative instructions should have contained or how such

instructions would have cured any errors. As Pawlak has failed to show that counsel's decision not to request curative instructions was unreasonable trial strategy, we reject his claim.

**{¶88}** Although failing to request a curative instruction may have been tactical, counsel could have remedied the admission of improper testimony by requesting a mistrial. *See State v. Brewer*, 2d Dist. Montgomery No. 24126, 2012-Ohio-2097, ¶ 15 (failure to request a mistrial or curative instruction may be deficient performance of trial counsel).

**{¶89}** An appellant alleging ineffective assistance of counsel because his attorney failed to move for a mistrial must establish that the trial court probably would have or should have declared a mistrial. *State v. Seiber*, 56 Ohio St.3d 4, 564 N.E.2d 408 (1990), citing *State v. Scott*, 26 Ohio St.3d 92, 95-96, 497 N.E.2d 55 (1986). A mistrial should not be ordered in a criminal case merely because some error or irregularity has occurred. *State v. Jones*, 10th Dist. Franklin No. 12AP-1091, 2014-Ohio-674, ¶ 19, citing *State v. Reynolds*, 49 Ohio App.3d 27, 550 N.E.2d 490 (2d Dist.1988). It is only appropriate when the substantial rights of the accused or prosecution are adversely affected, and a fair trial is no longer possible. *Illinois v. Somerville*, 410 U.S. 458, 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991).

**{¶90}** In this case, Pawlak contends that his substantial rights were adversely affected and a fair trial was no longer possible because the testimony was highly

prejudicial — "The allegation that a defendant charged with sexually molesting 11 to 12-year-old girls had sexual relations with other minor females, as young as 15, was simply devastating."

> As a legal term, "prejudice" is simply "damage or detriment to one's legal rights or claims." *Black's Law Dictionary* 1218 (8th Ed.1999). Thus, it is fair to say that all relevant evidence is prejudicial. That is, evidence that tends to disprove a party's rendition of the facts necessarily harms that party's case. Accordingly, the rules of evidence do not attempt to bar all prejudicial evidence — to do so would make reaching any result extremely difficult. Rather, only evidence that is unfairly prejudicial is excludable.

*State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 23.

> Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word "unfair." Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.

*Crotts* at ¶ 24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 2001-Ohio-248, 743 N.E.2d 890, quoting Weissenberger's *Ohio Evidence*, 85-87, Section 403.3 (2000).

{¶91} In support of his argument, Pawlak directs this court to the Sixth District's decision in *State v. Davis*, 6th Dist. Ottawa No. OT-09-032, 2010-Ohio-4383. In *Davis*, the defendant was charged with tampering with evidence where it was alleged that the defendant, while being searched following a traffic stop, swallowed drugs or attempted to conceal them in his mouth.

**{¶92}** During the trial, other acts evidence became an issue with the state's first witness. After defense counsel objected, the state represented to the court that it did not intend to present any Evid.R. 404(B) evidence against Davis. However, during the testimony of the state's third witness, Officer Barton, who was the chief investigating officer and a central witness for the state, testified that he executed the traffic stop where the defendant and another male were passengers in a vehicle. He stated he approached the passenger side of the car because he had "dealt with those two in the past. I have had some problems with those two in the past as far as narcotics complaints and everything else." *Id*. at ¶ 51.

**{¶93}** Defense counsel objected and during a side-bar discussion, the state indicated that Officer Barton knew that other acts testimony was off limits on direct examination. The trial court sustained the objection to the answer and instructed the jury to disregard the testimony, but the Sixth District ruled that a mistrial should have been granted.

**{¶94}** The Sixth District found that the "prejudicial comments directly related to the offense charged." Therefore, because the "injection of the inflammatory testimony of 'problems' with appellant 'in the past as far as narcotics complaints and everything,' prevented appellant from receiving a fair trial." *Davis,* 6th Dist. Ottawa No. OT-09-032, 2010-Ohio-4383, ¶ 79.

**{¶95}** In making this determination, the court noted the state's assurance that other acts testimony would not be presented and that Officer Barton's testimony was contrary to

what he was instructed. *Id.* at ¶ 74. The court also noted the significance of Officer Barton's testimony because there was a lack of physical evidence. *Id*. at ¶ 76. Furthermore, the court opined that because this was "not a case of overwhelming proof of guilt," it was "reasonably probable that the testimony of past contacts with the police and of past complaints concerning narcotics affected the outcome of this case." *Id*. at ¶ 79.

{¶96} In this case, the state contends that *Davis* is distinguishable because Davis's conviction was based entirely on the officer's testimony, whereas in this case, Pawlak was convicted based on the testimony of the five victims, and not P.B.'s testimony. We are not as convinced that P.B.'s testimony did not contribute to Pawlak's convictions, and we find the rationale in *Davis* persuasive.

{¶97} Much like in *Davis*, this case is not a case involving overwhelming evidence of guilt. There were no independent witnesses or physical evidence to corroborate the victims's testimony. Rather, this case was a credibility contest, and Pawlak's credibility was improperly questioned by the use of irrelevant and unfairly prejudicial other acts evidence. Reiterating the *Davis* court, we cannot consider a more prejudicial circumstance in which to inject alleged past indiscretions with minor-aged girls into a case; the prejudicial testimony was directly related to the offense charged. If this testimony was not in and of itself sufficient to warrant trial counsel to move for a mistrial, the subsequent testimony of P.B. concerning victim credibility and her opinion of defendant's guilt (which will be addressed in Pawlak's third assignment of error) was more than sufficient for defense counsel to request a mistrial.

**{¶98}** Moreover, and unlike in *Davis* where the officer's testimony was non-responsive to the state's questions, the testimony in this case was purposefully elicited by the prosecution and through the use of leading questions. However, nothing was done by defense counsel to eliminate this prejudicial testimony from the jury's consideration during deliberation. Accordingly, the error is more egregious. Further, it is probable that the trial court would have granted a mistrial if the motion were made, especially considering that the state gave no prior notice of its intent to use Evid.R. 404(B) "other acts" evidence against Pawlak.

**{¶99}** Accordingly, we find that counsel was deficient in failing to object or, in the alternative, failing to move for a mistrial. Counsel's failures fell below an objective standard of reasonableness; thus, the first prong of *Strickland* has been satisfied.

**{¶100}** The second prong of *Strickland* requires Pawlak to show that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674. Again, a reasonable probability is a probability sufficient to undermine the confidence in the outcome. *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d 373, quoting *Strickland* at 694. Often this prong is characterized as whether the defendant can show he was prejudiced by counsel's deficient performance.

**{¶101}** Again, this case is not a case involving overwhelming evidence of guilt. There were no independent witnesses and no physical evidence to corroborate the victims' testimony. Accordingly, it is probable that P.B.'s testimony regarding Pawlak's

prior indiscretions with girls ranging as young as age 15 affected the outcome of the case. Moreover, P.B. testified that Pawlak admitted to these interactions. Counsel's deficient performance in failing to make any attempt to remove this testimony from the jury's consideration was highly prejudicial. It is reasonably probable the jury's verdict was based on improper and inadmissable evidence.

**{¶102}** Pawlak's second assignment of error is sustained.

### B. Inadmissible Evidence

**{¶103}** P.B. testified during direct examination about her relationship with Pawlak and why she broke off their relationship. P.B. admitted that she did not break up with Pawlak over the allegations in this case because "she didn't know what to believe" because "victim 3 did not tell her until yesterday that Pawlak touched her," and victim 2 told her she had lied about the allegations. On cross-examination, P.B. testified that the girls never exhibited any attitude change towards Pawlak or that they were afraid to be around him, and none of the girls or their mothers ever approached her about any inappropriate behaviors. P.B. again reiterated that victim 3 did not tell her that any of the allegations were true until "yesterday." However, P.B. stated that victim 3 previously told her about an uncomfortable incident between her and Pawlak, which victim 3 thought was accidental.

**{¶104}** At the end of P.B.'s cross-examination, defense counsel posed the following questions, without objection by the state:

Q. As you sit here today, can you say you honestly know for sure what happened, at all, through all of this.

A.  No.  There's been so many different stories.  I mean, I know what the girls are saying now.

Q.  And when you say there have been so many different stories, that's all of the girls and all of the moms since December of last year, correct?

A.  Yes.

{¶105} Thereafter, the court permitted jurors to submit written questions to be asked to the witness.  Following a side-bar with counsel to review the questions submitted, the court asked P.B. the following juror question:

Q.  Now, do you believe the allegations of inappropriate activity with your ex-boyfriend are true?

A.  Do I believe all of them?  No.

{¶106} The court then asked the state if it had any redirect questions based on P.B.'s answer to the juror's question.  After the prosecutor indicated she had a question, the court conducted another side-bar with counsel.  Following side-bar, the state asked P.B.:

Q.  P.B., could you please clarify your last answer?

{¶107} Defense counsel objected, and the trial court sustained the objection.  The prosecutor then continued questioning P.B. about the different stories that she had heard and when she discussed the allegations with her daughters.

{¶108} After P.B. was excused as a witness, the trial court explained on the record and outside the presence of the jury, what occurred during the side-bar conversations:

During the questioning of the witness, P.B., juror questions were solicited and two sheets were passed forward. One of them says, "Was the first social worker Miss Davis?"

That was not objected to by either side.

The other says, "Do you believe the allegations of inappropriate activity with your ex-boyfriend are true?"

The State did not object, but the Defense did.

The Court overruled that objection for the reason that the Defense had just asked, without objection, a question that I would paraphrase as asking [P.B.], Do you know what is true here?

And if [I] recall correctly, she answered to the effect she really doesn't know what to believe.

While I think that question in the first place was objectionable, it was not objected to, so, as a result, I overruled Mr. Cheselka's objection to essentially asking what is basically the same question the second time.

However, so the point is that objection was overruled. There's no doubt that objection was made at the appropriate time so as to correct the record.

The only reason a record wasn't made then and there, it's my choice not to disrupt the proceedings by displacing the Court Reporter and so on.

I should mention that Miss Driscoll tried to redirect on that question, and as I contemplated it, I felt that even though the door was arguably opened by the Defense, it's kind of the door that never should have been opened in the first place, so Miss Driscoll's objection was sustained.
I'm sorry. Mr. Cheselka's objection to Miss Driscoll's redirect was sustained. In other words, that explains why I sustained that objection.

{¶109} Pawlak contends in this third assignment of error that the trial court abused its discretion in asking P.B. the juror question "[d]o you believe the allegations of inappropriate activity with your boyfriend are true[?]," because it garnered opinion testimony regarding the credibility of other witnesses and the guilt of the defendant.

{¶110} A trial court has broad discretion concerning the admission of evidence; in the absence of an abuse of discretion that materially prejudices a defendant, a reviewing court generally will not reverse an evidentiary ruling. *State v. Humberto*, 196 Ohio App.3d 230, 2011-Ohio-3080, 963 N.E.2d 162, ¶ 25 (10th Dist.) citing *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). A trial court abuses its discretion when its judgment is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶111} We first find that the juror question was improper because P.B.'s response required her to give an opinion about Pawlak's guilt and the credibility of the victims as they pertain to the allegations.

{¶112} Evid.R. 701 limits the testimony of lay witnesses to "those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue." P.B.'s answer that she did not believe all of the allegations was not based on her own perceptions, but rather on information she had received from other people. Additionally, her response was a subjective opinion that did not explain or help the jurors to understand her testimony. Accordingly, P.B.'s testimony was inadmissible under Evid.R. 701.

**{¶113}** Furthermore, lay witnesses are prohibited from testifying as to another witness's veracity. *State v. Kovac*, 150 Ohio App.3d 676, 2002-Ohio-6784, 782 N.E.2d 1185, ¶ 32 (2d Dist.). "'[I]t is the fact-finder, not the so-called expert or lay witness, who bears the burden of assessing the credibility and veracity of witnesses.'" *State v. Burchett*, 12th Dist. Preble Nos. CA2003-09-17 and CA2003-09-18, 2004-Ohio-4983, ¶ 19, quoting *State v. Boston*, 46 Ohio St. 3d 108, 129, 545 N.E.2d 1220 (1989).

**{¶114}** In *Boston*, a jury found a father guilty of gross sexual imposition against his two-year-old daughter. During trial, the court allowed a pediatrician who had examined the child to testify that the child had neither fantasized her abuse nor been programmed to make the accusations of abuse. The court also allowed a counselor who had examined the child to testify that the child had been telling the truth. The supreme court concluded that the admission of these testimonies was improper, egregious, prejudicial, and constituted reversible error. *Id.* at 128.

**{¶115}** While Evid.R. 608(A) permits testimony regarding a witness's general character or reputation for truthfulness, the rule prohibits testimony regarding a witness's truthfulness on a particular occasion. The *Boston* court explained that the admission of testimony that, in effect, declared that the child's statements had been truthful "acted as a litmus test of the key issue in the case and infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility." *Id.* at 128-129, quoting *State v. Eastham*, 39 Ohio St.3d 307, 312, 530 N.E.2d 409, (1988) (Brown, J., concurring). The court emphasized that "in our system of justice it is the fact finder, not

the so-called expert or *lay witnesses*, who bears the burden of assessing the credibility and veracity of witnesses." (Emphasis sic.) *Id*.

{¶116} In this case, P.B.'s testimony was in direct violation of *Boston* because she offered her opinion as to the truth of the victims' accusations. However, a *Boston* violation may be harmless error beyond a reasonable doubt when considering certain factors. Those factors include "(1) if the victim testifies and is subject to cross-examination, (2) the state introduces substantial medical evidence of sexual abuse, and (3) the expert or lay person's opinion testimony is cumulative to other evidence." *State v. Palmer*, 9th Dist. Medina No. 2323-M, 1995 Ohio App. LEXIS 514 (Feb. 8, 1995); *State v. Lewis*, 9th Dist. Summit No. 14632 (Aug. 14, 1991); *State v. Djuric*, 8th Dist. Cuyahoga No. 87745, 2007-Ohio-413, ¶ 44. However, a finding of harmless error is not justified if the case is a "credibility contest" between the victim and the defendant. *State v. Burrell*, 89 Ohio App.3d 737, 746, 627 N.E.2d 605 (9th Dist.1993). Accordingly, in order to find a *Boston* violation harmless, some independent evidence must exist when it is a credibility contest between the defendant and the victim. *State v. West*, 8th Dist. Cuyahoga No. 90198, 2008-Ohio-5249; *State v. Winterich*, 8th Dist. Cuyahoga No. 89581, 2008-Ohio-1813; *State v. Knight*, 8th Dist. Cuyahoga No. 87737, 2006-Ohio-6437.

{¶117} This court recently addressed a similar circumstance and the effect of *Boston* in *In re R.E.A.*, 8th Dist. Cuyahoga No. 99652, 2014-Ohio-110. During trial, the victim testified that she was sexually abused by the defendant. No physical evidence was

presented. However, Dr. Feingold testified that he found the victim was sexually abused based solely on the victim's statements. In finding that the failure to challenge the opinion testimony constituted ineffective assistance of counsel, this court sustained the assigned error and ordered a new trial. In doing so, this court stated that counsel's failure to object to the doctor's opinion testimony "was prejudicial to [the defendant's] defense because the entire case hinged on [the victim's] credibility." *Id*. at ¶ 24.

{¶118} Likewise, in this case, the state's entire case against Pawlak hinged on the victims' credibility because no eyewitness or physical evidence was presented. The victims did testify in this case and were all subject to cross-examination prior to P.B.'s testimony. However, due to the length in time between the alleged incidents and reporting the allegations, the inconsistencies, recantations, and lack of corroborating testimony or evidence, we find that the *Boston* violation is not harmless beyond a reasonable doubt. Accordingly, much like in *In re R.E.A.*, the case against Pawlak was a credibility contest.

{¶119} The state contends that if P.B.'s testimony was improper, it amounted to harmless error because the proceedings would not have ended differently but for P.B.'s testimony. The state contends that P.B.'s response was more likely helpful to Pawlak's case because the victims' credibility was damaged by P.B.'s response. However, the opposite effect could equally be true — P.B.'s testimony was more likely harmful because the victims' credibility was bolstered.

**{¶120}** P.B. was the mother of two of the victims and the girlfriend of Pawlak. P.B. had a conflicting interest in protecting and advocating for her daughters, while being torn with her commitment towards Pawlak — a man she had known since age 10 and dated for five years. We find that P.B.'s answer to the juror's question was pivotal in Pawlak's conviction. Her answer was clearly a "litmus test" for the jurors in weighing credibility — if she believed the allegations, then the victims, including her daughters, were truthful.

**{¶121}** A review of the record demonstrates that the trial court also believed that the question was improper. The subsequent explanation at side-bar by the trial court demonstrates that the court felt that the initial question by the defense was improper; however, because the state did not object, the trial court allowed the witness to answer. Even believing it was improper, the court continued to allow the improper questioning about believability and veracity over defense objection because it felt that the defense had "opened the door" when counsel asked P.B. whether she "honestly [knew] for sure what happened, at all, through all of this." According to the trial court's explanation, it felt that the follow-up juror question of whether "you believe the allegations are true" was "basically the same question" just asked by defense counsel. Accordingly, unless the defense opened the door, the testimony was improper.

**{¶122}** "Under the 'opening the door doctrine,' where a party has elicited or introduced prejudicial or inadmissible testimony, his opponent, in the trial court's discretion, may introduce evidence on the same issue in order to rebut any false

impression that may have resulted from the earlier admission." *State v. McGuire*, 2d Dist. Montgomery No. 25455, 2013-Ohio-3280, ¶ 21 quoting *State v. Deleon*, 2d Dist. Montgomery No. 18114, 2001 Ohio App. LEXIS 2353 *8, (May 25, 2001), citing *United States v. Segines*, 17 F.3d 847, 856 (6th Cir.1994). A prerequisite of any view regarding "opening the door" is that the initial evidence was somehow prejudicial to the party attempting to present rebuttal evidence. *State v. Staats*, 9th Dist. Summit No. 15706, 1994 Ohio App. LEXIS 1608 *9, (Apr. 13, 1994).

{¶123} In this case, we find that P.B.'s answer to defense counsel's questions was not prejudicial to the state. P.B. stated that based on the different stories by the victims and their mothers, she did not know what happened. This was a true statement, and a reading of the entire trial testimony substantiates P.B.'s inability to comprehend what occurred in this case. The evidence demonstrated that there were inconsistencies, recantations, and a lack of corroborating testimony or evidence. Therefore, the testimony was not prejudicial to the state. Moreover, the trial court properly allowed the state to question P.B. on redirect question the different stories and when they were told. In fact, a review of the transcript shows that the state on direct examination first elicited testimony from P.B. about what she believed. In response to the state's question about why she did not break up with Pawlak after the allegation surfaced, P.B. responded that she "didn't know what to believe." (Tr. 631.)

{¶124} Notwithstanding that P.B.'s answer to defense counsel's questions regarding what she knew were not prejudicial to the state, the prerequisite as stated above

was not satisfied because the state was not the party attempting to present rebuttal evidence; rather, the jury submitted the question to P.B.  Accordingly, the trial court's justification for allowing the juror question was in error.

{¶125} As gatekeeper of evidence, the trial court allowed otherwise inadmissible evidence to be elicited from a witness because it felt the defense opened the door.  The trial court recognized the line of questioning was objectionable.  The trial court abused its discretion in permitting rebuttal testimony when the state had no objection to defense counsel's initial questions.  As this court recognized, "[c]ontrol of the trial should not be dissipated on the theory that two wrongs neutralize each other unless the court is convinced that there is no other practicable way to protect the parties while avoiding the dreadful waste of a mistrial."  *State v. Richardson*, 8th Dist. Cuyahoga No. 50424, 1986 Ohio App. LEXIS 6596, *6-7, (May 1, 1986), quoting 1 Weinstein, *Evidence*, Section 103, at 15 to 16 (1988).  Accordingly, we find that the trial court abused its discretion in asking the juror question to P.B. regarding whether she believed the allegations against Pawlak were true.  The testimony was inadmissible under *Boston*, and it was not a harmless violation.

{¶126} Accordingly, Pawlak's third assignment of error is sustained.

### III.  Conclusion

{¶127} Sustaining both assignments of error two and three, we find that trial counsel was ineffective, and the court's allowance of the jury question violated Pawlak's

right to a fair trial. Accordingly, we reverse Pawlak's convictions and remand for a new trial.

{¶128} Having sustained Pawlak's second and third assignments of error and ordering a new trial, Pawlak's fourth assignment of error contending that the court erred in denying his motion for a new trial is hereby rendered moot.

{¶129} Reiterating the Ohio Supreme Court, "[w]e are also mindful that our role upon review of this case is not to sit as the supreme trier of fact, but rather to assess the impact of this erroneously admitted testimony on the jury." *State v. Rahman*, 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986).

> "[I]t is not the appellate court's function to determine guilt or innocence * * *. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out * * *. [T]he question is, not were [the jury] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting."

*Id.*, quoting *United States v. Hasting*, 461 U.S. 499, 516, 103 S.Ct. 1974, 76 L.Ed2d 96 (1983) (Stevens, J., concurring), quoting *Kotteakos v. United States*, 328 U.S. 750, 763-764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

{¶130} Judgment reversed; case remanded for new trial.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

KATHLEEN ANN KEOUGH, JUDGE

FRANK D. CELEBREZZE, JR., P.J., and
MARY EILEEN KILBANE, J., CONCUR