[Cite as *State v. Hicks*, 2025-Ohio-2223.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,          :

                     No. 114432

v.                                       :

TRAVIS HICKS,                            :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN PART,
                AND REMANDED
**RELEASED AND JOURNALIZED:** June 26, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-679356-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Eric Collins and Anna Faraglia, Assistant
Prosecuting Attorneys, *for appellee.*

Law Office of Schlachet & Levy and Eric M. Levy, *for
appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Travis Hicks ("Hicks") appeals his convictions stemming from the murder of Ronnie Briggs ("Briggs" or "Boonie") on the evening of September 25, 2022. After a thorough review of the record and law, this court affirms in part,

vacates in part, and remands for the limited purpose of resentencing on Counts 6 and 7.

## I. Procedural History

{¶ 2} On March 28, 2023, a grand jury indicted and charged Hicks with aggravated murder pursuant to R.C. 2903.01(A) (Count 1), murder pursuant to R.C. 2903.02(A) (Count 2), murder pursuant to R.C. 2903.02(B) (Count 3), felonious assault pursuant to R.C. 2903.11(A)(1) (Count 4), felonious assault pursuant to R.C. 2903.11(A)(2) (Count 5), having weapons while under disability pursuant to R.C. 2923.13(A)(2) (Count 6), having weapons while under disability pursuant to R.C. 2923.13(A)(3) (Count 7), and discharge of firearm on or near prohibited premises pursuant to R.C. 2923.162(A)(3) (Count 8). Counts 1 through 5 and Count 8 each contained one- and three-year firearm specifications.

{¶ 3} A jury found Hicks guilty of all charges and firearm specifications. The court sentenced him to 34 years to life. This appeal followed, and Hicks assigns four errors for our review:

> I. The trial court erred when it convicted Hicks of aggravated murder in Count 1 absent sufficient evidence of prior calculation and design.
>
> II. Hicks'[s] convictions for all offenses [were] based upon a finding that Hicks was the shooter which is against the manifest weight of the evidence presented at trial and could not be found beyond a reasonable doubt.
>
> III. Hicks was prejudicially denied effective assistance of trial counsel where counsel failed to object to testimony of [lay] witnesses C.W. and D.P. that Hicks [possessed] a firearm in a video where neither personally viewed the events.

IV. Hicks's sentence is clearly and convincingly contrary to law where the trial court failed to merge Counts 6 and 7 for purposes of sentencing despite the prosecution conceding the issue of merger and electing to proceed to sentencing on Count 6.

## II. Factual History

{¶ 4} On September 25, 2022, at around 1 a.m., Briggs, who was 27 years old, was shot and killed at Showcase Bar & Grille ("Showcase") in Garfield Heights, Ohio.

### A. **The Crime Scene at Showcase**

{¶ 5} Brigg's mother, Monica Briggs ("Monica"), testified that on the date of the shooting, she was celebrating her daughter's birthday with a group of six to eight people, including Briggs. They ended the evening at Showcase, where Briggs had been a co-owner for just over a year. (Tr. 322.) Monica, who entered through the side door, noted that the bar was more crowded than usual and did not stay inside of the bar long before proceeding out of the front entrance to the patio.

{¶ 6} Shortly thereafter, Briggs came out to the patio, handed Monica a drink, and then headed towards the gate of the patio, where a large crowd of people who had been denied entry into the bar were gathered. Monica explained that the bar was limiting entry because of the amount of people. Showcase had been previously warned about violations of the fire code "at least a few" times. (Tr. 417.) Monica testified that she saw Briggs grab a man who attempted to jump over the patio gate to gain entry into Showcase. The two men "started to fight a little bit" and then "shots rang out." (Tr. 326.) She did not observe anyone actually firing shots,

testifying that she dropped to the ground as soon as she heard them. When Monica stood, she saw Briggs on the ground and "blood was just pouring out of his head." (Tr. 327.) Her testimony was largely corroborated by a video of the incident that was provided by a neighboring bar, Unkut Lounge ("Unkut").

{¶ 7} The next day, Monica received a text message from an unknown number urging her to investigate "Chayy" and "Travis." She also received information from LaMarr Davis, co-owner of Showcase about Chavonne Washington ("Washington"), who "was pregnant by one of the Hicks brothers." (Tr. 331.) Monica provided this information to the detective assigned to the case, Detective Phillip Herron ("Det. Herron").

{¶ 8} Garfield Heights police officer James Huskey ("Ptl. Huskey") testified that at the time of the shooting, he was parked in a grocery store parking lot where patrons of Showcase and other surrounding bars are known to park. He stated the area is known for its popularity and "a lot of our calls will generate in that area at nighttime." (Tr. 340.) Ptl. Huskey testified that he heard several gunshots, screaming, and observed people running from the area. He immediately radioed for additional officers and drove out of the parking lot towards Showcase before Patrolman Matthew Taylor ("Ptl. Taylor"), Patrolman Michael Malak ("Ptl. Malak"), and Sergeant Spencer Sabelli ("Sgt. Sabelli") arrived on scene.

{¶ 9} Ptl. Huskey observed a male lying on the sidewalk surrounded by a group of people. According to Ptl. Huskey, accessing the victim was complicated because "probably 150 people" had not dispersed the scene and, thus, he waited for

additional officers to arrive before assessing Briggs. (Tr. 345.) Ptls. Taylor and Malak both testified that the scene was crowded and chaotic.

{¶ 10} Ptl. Malak rendered aid to Briggs, including applying a tourniquet to his lower extremities while Ptl. Taylor applied pressure to what he believed was a bullet wound on the left side of the victim's head. Both Ptls. Taylor and Malak testified that at this time, Briggs was still breathing. The body-camera footage from Ptl. Malak showed people surrounding him and that he was being pushed around as he attempted to render aid. These difficulties caused him to call for more backup units. As they administered aid, Ptl. Huskey and Sgt. Sabelli secured the scene, made a path for the ambulance, and placed caution tape around the area as they awaited the arrival of the detectives.

{¶ 11} After the ambulance had left with Briggs, the officers requested assistance from neighboring police departments due to the size of the crowd and continued crowd-control measures and securing the crime scene. After the crime scene had been fully secured, Ptl. Huskey proceeded to MetroHealth where he spoke with a social worker and Briggs's family to gather basic information. After Briggs was assessed, it was determined that Briggs would not be able to survive the necessary head surgery and life support was discontinued.

{¶ 12} Dr. David Dolinak of the Cuyahoga County Medical Examiner's Office testified that he performed an autopsy on Briggs and confirmed that Briggs's death was caused by gunshot wounds; Briggs suffered three gunshot wounds, one in each thigh, and a shot to the head, which was fatal.

## B. **Physical Evidence Collection**

{¶ 13} Sgt. Sabelli and Det. Herron responded to the scene for evidence collection. Sgt. Sabelli took photographs of the crime scene, which were admitted as State's exhibit Nos. 5 through 29. Sgt. Sabelli marked, photographed, and collected shell casings in various locations, including on the sidewalk in front of Unkut and the sidewalk in front of Legendary Barbershop. He also marked, photographed, and collected a black jacket covered in blood and brain matter that was recovered from the area near Briggs. Sgt. Herron also took photographs of the scene, which were admitted as State's exhibit Nos. 42 through 83. Sgt. Herron testified that collecting evidence was impeded by a heavy rain that fell "about five minutes after I arrived." (Tr. 839.)

{¶ 14} Sgt. Sabelli was approached by "Mr. Hernandez," the driver of a red Jeep who indicated to the officer that his vehicle had been struck by gunfire on the passenger side. Sgt. Sabelli took a photo of the passenger compartment of the vehicle as well as a bullet fragment and told Mr. Hernandez to wait for Det. Herron to arrive on scene. Det. Herron collected the bullet fragment from the passenger compartment and released the Jeep back to Mr. Hernandez.

{¶ 15} Det. Herron and Ptl. Malak reviewed and retrieved video surveillance from Unkut, which contained footage of the scene prior to, during, and after the shooting.[1]

{¶ 16} Despite the heavy police presence, none of the officers attempted to interview any eyewitnesses or collect information from bystanders who were present at the crime scene.

C. **Suspect Identification**

{¶ 17} Detective Peter Stroe ("Det. Stroe") reviewed the surveillance videos as part of his investigation and testified about the footage as it played for the jury. Of significance, he noted where a group of people from the grocery store parking lot walked across the street to Showcase prior to the shooting. Still photos showing these individuals from three different camera angles were released to the public for identification or informational purposes. Det. Stroe also flagged a portion of the video after the shooting, where the crowd began dispersing from the scene. He noted a male wearing a hood who appeared to have a firearm in his hand.

{¶ 18} Detective Rick Fogle ("Det. Fogle") testified that he administered a photo lineup of potential perpetrators to Raina Collins whose involvement with this case is never revealed to the jury. Collins circled Hicks and indicated that she was 100% certain of her choice. On cross examination, Hicks's counsel addressed the

---

[1] On cross-examination, Det. Stroe stated that Showcase has surveillance cameras inside and outside of the bar but Showcase does not typically cooperate with police investigations, while Unkut is usually cooperative.

fact that photographs of Hicks had been released by the police prior to the incident, and that Det. Fogle did not ask Collins if she had heard of or seen any information relating to the case.

{¶ 19} Chavonne Washington ("Washington") appeared at the Garfield Heights Police Department to make a statement after someone had identified her in the released still photographs. Det. Stroe blind administered photo lineups of potential suspects to Washington, where she identified Hicks as a suspect and indicated that she was "80 to 90%" certain of her choice.

{¶ 20} At trial, Washington testified that she was "kicking it" with Hicks on the evening of the incident but, at that time, she knew him only as "Will." (Tr. 686.) She testified that she had been casually seeing "Will" for about two weeks prior to this incident. (Tr. 676.) After attending a block party, her cousin DaQuita Parks drove a group that included both her and Hicks to Showcase that evening.

{¶ 21} During the investigation, Washington identified Hicks and herself in still photographs from Unkut's surveillance footage showing them walking towards Showcase and then a still photograph from after the incident showing "Will" walking across the street with "something black in his hand" that Washington admitted looked like a gun. (Tr. 701.) When shown these images again at trial, Washington denied that the item in Hicks's hand was a gun and suggested that it could be a phone.

{¶ 22} Officer Sean Sabelli, not to be confused with Sgt. Sabelli, testified that he acted as a blind administrator and showed a photo lineup to DaQuita Parks, who selected Hicks and indicated that she was "100%" certain of her choice.

## D. **Physical Evidence**

{¶ 23} Curtiss Jones ("Jones"), a supervisor in the Trace Evidence Unit at the Cuyahoga County Regional Forensic Science Laboratory, testified that he examined and photographed Briggs's body and prepared a report relative to his examination. Jones also examined and took swabs from the clothing that Briggs was wearing at the time of the shooting. Of note, Briggs's jeans contained four bullet holes (two entry and exit holes) that were examined for gunshot residue and muzzle target distance. Jones's examination revealed that the gun was not close to Briggs when he was shot.

{¶ 24} Thomas Morgan ("Morgan"), a supervisor in the firearm and toolmark unit at the Cuyahoga County Regional Forensic Science Laboratory testified that he reviewed a projectile recovered from Briggs's body, which he concluded was a ".38/9mm caliber copper jacketed bullet" and "a small copper jacketed fragment [and] one gray metal fragment." (Tr. 608.) He also examined and prepared a report relating to a bullet fragment taken from Mr. Hernandez's vehicle. Morgan concluded that the newly submitted bullet fragment and the bullet recovered during Briggs's autopsy "were fired from the same unknown firearm." (Tr. 619.)

{¶ 25} Andrew Chappell, a forensic scientist in the firearms section of the Bureau of Criminal Investigation, testified that he analyzed four 9 mm spent cartridge casings collected from the scene and determined that three of the casings came from the same unknown firearm and one came from a different firearm.

### E. Digital Evidence

{¶ 26} Agent Todd Porinsky ("Porinsky"), the team leader of the mobile wireless investigation team for the U.S. Secret Service, testified that he reviewed Hicks's cell phone geolocation records. According to Porinsky, Hicks was in the vicinity of Showcase at 12:26 a.m. on the date of the incident where the phone remained until about 1:10 a.m. A minute later, at 1:11 a.m., the phone pinged off a different tower, indicating that Hicks's phone was no longer in the vicinity of Showcase.

{¶ 27} Agent Jacob Kunkle of the Federal Bureau of Investigations also testified regarding his analysis of cell phone geolocation records based on incoming and outgoing call data from a cell phone number allegedly belonging to Hicks. He prepared a report related to his findings, which was introduced as State's exhibit No. 180, and indicated, again, that Hick's alleged phone was in the "general vicinity" of Showcase on the morning of the shooting.

### F. Chavonne Washington's Testimony

{¶ 28} Washington offered the following testimony about the events. Parks drove her, Hicks, and others to Showcase and parked across the street. They crossed the street and approached Showcase, where they were denied admission because it

was "over capacity." (Tr. 680.) Washington noted that the bar was uncharacteristically charging a cover, "ten or twenty [dollars]," and that people were unhappy about that, so people were "trying to force themselves in there." (Tr 683.) Washington testified that she noticed fighting involving "Boonie," one of the bar owners, but that she did not know any other involved individuals. She stated that she heard gunshots and ran back to Parks's car across the street. She testified that once Hicks and the others returned to the car, they drove to a gas station because "Monny," another passenger, "wanted to get some stuff." (Tr. 688.) According to Washington, while at the gas station, Hicks exited the car, walked behind it, and "went with somebody else." (Tr. 689.) Washington testified that she did not find this unusual and explained that it is typical for people to follow each other and convene at a central location, so it was likely that he knew someone and went with them instead. She denied having contact with Hicks since the date of the incident, and testified that she did not have his phone number.

{¶ 29} On cross-examination, Washington was asked about a conversation she had with Michael Dozier, the father of her child who was in jail at the time of the shooting. In the jail call, she identified the two people who jumped the gate as "Louie and Nitty" and, when asked about these people at trial, stated that she did not give Det. Herron these names because he did not ask about who jumped the gate. When asked about telling Dozier that "her people" were involved in the fight, she explained that "I mean, everybody was together, but them was not. I know that we all was together, but we – you know, they're not my people, but they were two people who I

came with." (Tr. 735.) Washington denied trying to protect anyone and stated that "[i]t was a blurry night" because she had been drinking. (Tr. 721.)

### G. Daquita Parks's Testimony

{¶ 30} Parks testified at trial. She stated that she did not remember much of the evening leading up to the incident but testified that she had just met Hicks earlier that evening and never knew him as "Will." Instead of going to Showcase, she went next door to Unkut, testifying that you must be 35 years old or older to enter Unkut. Parks had some drinks and after about a half hour, she left the bar and saw people running. She stated that she did not hear any gunshots, attributing it to the music playing in Unkut. Parks testified that she ran towards her car where her passengers were already waiting. According to Parks, she did not talk to any of her passengers about the shooting and did not inquire as to what happened. Like Washington, Parks testified that they stopped at a gas station at 93rd Street and Harvard Avenue but instead of stating that Hicks went into a different vehicle, she testified that everyone returned to the car after going into the gas station and they proceeded home.

### III. Law and Analysis

### A. Sufficiency of Evidence: Prior Calculation and Design

{¶ 31} Hicks's first assignment of error disputes that the State presented sufficient evidence to support the element of aggravated murder requiring evidence of prior calculation and design.

{¶ 32} To convict Hicks of Count 1, aggravated murder, the State was required to present evidence beyond a reasonable doubt that Hicks "purposely, and with prior calculation and design, caus[ed] the death of [Briggs]." R.C. 2903.01(A). "In reviewing whether evidence is sufficient to establish the prior-calculation-and-design element of aggravated murder, a court must consider whether the evidence, when viewed in the light most favorable to the prosecution, supports a finding that a defendant acted with advance reasoning and purpose to kill." *State v. Jones*, 2021-Ohio-3311, ¶ 2. The State must prove "evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *State v. Walker*, 2016-Ohio-8295, ¶ 18. "A trier of fact's finding of prior calculation and design is warranted when the evidence shows a defendant had the time and opportunity to plan a homicide and the homicide's circumstances '"show a scheme designed to implement the calculated decision to kill."'" *Jones* at ¶ 17, quoting *State v. Maxwell*, 2014-Ohio-1019, ¶ 148, quoting *State v. Cotton*, 56 Ohio St.2d 8 (1978), paragraph three of the syllabus.

{¶ 33} Three factors enumerated in *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997), "help guide a court's inquiry" into whether a defendant acted with prior calculation and design, but these factors are not dispositive and the decision turns instead on the particular facts and evidence presented. *Jones* at *id*. These factors are "(1) [d]id the accused and the victim know each other, and if so, was that relationship strained? (2) [d]id the accused give thought or preparation to choosing

the murder weapon or murder site? and (3) [w]as the act drawn out or an almost instantaneous eruption of events?" *Taylor* at *id.*

{¶ 34} Among arguing that the first two *Taylor* factors are not satisfied by the evidence, Hicks contends that the evidence herein is akin to an "instantaneous eruption of events" as contemplated in the third *Taylor* factor. Hicks relies on *Walker*, where the Ohio Supreme Court, considering facts similar to this case — a barfight that escalated into a homicide by fire, ultimately vacated an aggravated murder conviction because the State failed to present sufficient evidence of prior calculation and design. In analyzing the video surveillance and witness testimony in *Walker*, the Supreme Court noted that in the video surveillance of the incident, Walker was obscured behind a pillar for approximately 20 seconds before the gunshot. *Id.* at ¶ 26. The *Walker* Court concluded that while a jury "could reasonably infer that during that time, Walker decided to kill [the victim] by shooting him . . . it could not reasonably infer that he planned the murder beforehand with prior calculation and design." *Id.* As such, *Walker* held that prior calculation and design requires evidence that supports "more than the inference of purpose" because "[i]nferring prior calculation and design from an inference of purpose is mere speculation." *Id.* Moreover, while "instantaneous deliberation" is insufficient to constitute prior calculation and design, the Ohio Supreme Court has noted that

> [w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide

show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.

*Cotton* at syllabus.

{¶ 35} After a careful review of the record before us, we determine that this case is distinguishable from and more nuanced than *Walker,* 2016-Ohio-8295.

{¶ 36} We first address State's exhibit No. 201, the surveillance footage of the shooting taken from Unkut.  At timestamp 00:38:15, individuals identified as Washington (in a white jacket) and Hicks (in a cream hoodie with a pattern on the back) cross the street and walk to Showcase's patio, where many people are gathered.  Hicks and Washington walk around the gated patio, sometimes appearing to engage with other people.  Hicks retreats from the crowd around the gate's perimeter and stands overlooking the patio. (00:47:43).   Around 00:52:01, Washington appears to tap Hicks and he proceeds to the corner of the patio, still outside of the gate.  Hicks is approached by two individuals, one of whom is clothed in all red, who ultimately jumps the gate before the tussle with Briggs begins. (00:52:48). Washington also speaks to these individuals. (00:53:20.) At 00:54:35, Hicks crosses the street and walks back towards the parking lot, and Washington follows shortly thereafter. (00:54:42.)  Another group, including the individual wearing all red, crosses from Showcase to the parking lot across the street. (00:56:57.) At 01:00:17, Washington and Hicks, along with several other individuals, return from the parking lot and proceed back to Showcase, where Hicks retreats to the corner of the patio (1:00:44) and is no longer easily visible on the

surveillance footage. Washington is also in this area on the corner of the patio and is seen standing and mingling among the individuals who eventually jump the patio gate. (01:05:40). The individual in all red jumps the gate. (01:07:59). An individual in a white T-shirt jumps the gate shortly thereafter. (1:08:18). Briggs is seen running and hits the individual in the white T-shirt, who immediately strikes back. (01:08:20). Another individual appears to join the fight with Briggs. Then, around 1:08:25, Hicks comes into view from the corner and extends his right arm and, as Det. Herron testified, muzzle flashes are seen coming from his right hand; he briefly puts his arm down and then puts it back up again, presumably firing another shot. Hicks then runs, joining Washington who had already started running across the street. In the video, as Hicks is running, he is seen holding an item in each hand. He doubles back, appears to survey the crime scene, and resumes running towards the parking lot during which time the item in his left hand illuminates and appears to be a cell phone. (01:08:33).

{¶ 37} The video evidence indicates that Hicks was on-scene for nearly an hour before he fired the shots that killed Briggs. He is mostly standing in the same place, observing the patio scene from outside of the gate. The context given by both Monica and Washington indicates that Showcase was busier than normal, and Washington testified that it was charging a cover that people were upset about. Washington, Hicks, and at least one individual who ultimately ended up in the altercation with Briggs, leave the patio and walk towards the parking lot. Washington testified that she left during this time because she had to use the

bathroom and that she did not know what Hicks was doing during this time that they were in the parking lot. During this walk to the parking lot, video evidence does not show that Hicks has a gun. Hicks and Washington returned to the patio together, walking with a group of people, whom Washington did not know. When asked if Hicks knew the group of people, Washington stated that he "probably" did. (Tr. 711.) After returning from the parking lot, Hicks fired his weapon after his "probable" acquaintances began fighting with Briggs. From these facts, the jury may have inferred that Hicks went back to the parking lot to retrieve a gun, thus demonstrating prior calculation and design separate from mere purpose.

{¶ 38} It is also noteworthy that Hicks and Washington appear to be familiar with some of the people in the patio area and were all gathered in the same area of the patio prior to the altercation with Briggs. Washington stated that she knew Briggs prior to the shooting, though not personally, leading to an inference that the others knew Briggs prior to the shooting. Further strengthening the premeditated nature of the shooting, the State presented evidence that Washington made a telephone call to her child's father on the same date of the shooting and she identified "Louie" and "Nitty" as the two people who jumped the gate and fought with Briggs, and she identified them as "my people." (Tr. 720.)

{¶ 39} The evidence suggests that Hicks was "lying in wait" as he stood in the corner of the patio watching his probable acquaintances fight with Briggs and then emerged, facing no danger himself and not being involved in the actual affray, and fired a gun multiple times with at least one of the shots occurring after he had put

his arm down, deciding that he was going to fire once more.  This contrasts with *Walker*, 2016-Ohio-8295, where Walker was directly involved in the fight that more closely suggests that the decision to shoot was spontaneous rather than calculated.

{¶ 40} When viewing these facts in the light most favorable to the State, we find that the State presented evidence sufficient to support a finding that Hicks acted with "prior calculation and design."  Although Hicks contends that the whole altercation and shooting lasted about eight seconds, he ignores that Hicks shot Briggs almost an hour after arriving at Showcase and went back to the parking lot at some point before shooting Briggs.

{¶ 41}  We overrule Hicks's first assignment of error.

### B. **Manifest Weight of the Evidence**

{¶ 42} Hicks's second assignment of error contends that all of Hicks's convictions, particularly those premised on Hicks as the shooter, were against the manifest weight of the evidence.

{¶ 43} Specifically, he challenges the evidence identifying him as the shooter.  Hicks contends that he was not discovered until months after the shooting "after police did a very minimal investigation," that witnesses on scene were never sought out or interviewed, and that the Unkut video does not show the facial features of the suspect.

{¶ 44} "'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. . . . Weight is not a question of mathematics, but depends on its effect

in inducing belief.""" (Emphasis omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, quoting *Black's Law Dictionary* (6th Ed.1990). In a manifest-weight analysis, the reviewing court sits as a "thirteenth juror" and reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered.'" *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction." *Id.*, quoting *id.*

{¶ 45} Hicks's contention that his identity could not be discerned from the evidence presented is without merit. Both Washington and Parks identified Hicks in a photo array as the individual who was with them that evening. Washington identified herself in the surveillance footage and stated that she was walking with Hicks. The person identified as Hicks is seen raising his right arm in a typical shooting fashion, followed by muzzle flashes coming from his right hand. Hicks then runs away from the scene with an object in each hand, one of which appears to be a phone and the other appears to be a gun. Cell phone geolocation data places Hicks at the scene on the date and time of the shooting and away from the scene very shortly after the shooting occurs. No evidence was presented that anyone other than Hicks was firing or even carrying a gun that morning.

{¶ 46} Based on the foregoing evidence in the record, we cannot say that the evidence of Hicks's identity weighs heavily against conviction. Additionally, the jury heard, through cross examination or otherwise, the arguments that Hicks advances including the time it took to identify him, that no witnesses were interviewed at the scene, that Parks did not witness the shooting but identified Hicks in the photo array, and that Washington allegedly did not see anyone shooting but identified Hicks in the photo array. Also, the jury saw the shooting unfold from the Unkut video for themselves. Despite all of this, the jury was satisfied, beyond a reasonable doubt, that Hicks was the perpetrator. Hicks's second assignment of error is overruled.

## C. Ineffective Assistance of Counsel

{¶ 47} Hicks's third assignment of error concerns the effectiveness of his trial counsel, specifically, trial counsel's alleged failure to object to the State asking Washington and Parks "regarding whether the shooter in the video was holding a firearm when neither saw the shots fired and neither saw Appellant Hicks with a firearm." He also takes issue with Det. Herron's testimony that the item in Hicks's hand was a gun and his testimony identifying Hicks in the video and also asserts that the surveillance video was not properly offered as evidence at trial.

{¶ 48} To establish a claim of ineffective assistance of counsel, a defendant must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668,

(1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 695. In reviewing a claim of ineffective assistance of counsel, a reviewing court must give great deference to counsel's performance. *Id.* Thus, we strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.).

{¶ 49} "Trial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel." *State v. Foster*, 2010-Ohio-3186, ¶ 23 (8th Dist.), citing *State v. Clayton*, 62 Ohio St.2d 45 (1980). "'[A]ny single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the [S]tate.'" *State v. Johnson*, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (C.A.6, 2006).

{¶ 50} First, we do not find that any of Hicks's cited "errors" were so prejudicial that their admission defaulted the case to the State.

{¶ 51} Second, we do not find that this testimony or evidence was improper and therefore required objection. Washington, Parks, and Det. Herron were testifying as lay witnesses and giving their "opinions or inferences . . . rationally based on the [witness's perception.]" Evid.R. 701. In this case, each of these witnesses gave opinion testimony on their personally observed perception of the video surveillance still photographs. Hicks's assertion that this opinion testimony violated the "best evidence" rule is misplaced. Evid.R. 1002 requires that "to prove

the content of a . . . recording . . . the original . . . recording . . . is required[.]" Washington's, Parks's, and Det. Herron's testimony was offered as opinion testimony, not to prove the contents of the video, which we note was offered into evidence as well to comply with Evid.R. 1002. Additionally, to the extent that Hicks argues that the surveillance footage was not or would not be properly admitted, we note that the record disputes this contention. Evid.R. 901(A) requires "evidence sufficient to support a finding that the matter in question is what its proponent claims." Det. Herron testified extensively regarding the acquisition and verification of the surveillance footage and the process undertaken to obtain it. Hicks cannot point to anything suggesting that this foundation was insufficient to authenticate or identify the surveillance footage.

{¶ 52} Hicks's third assignment of error is overruled.

### D. Merger – Error Conceded by the State

{¶ 53} Hicks's fourth assignment of error contends that during sentencing, the trial court imposed separate sentences on Counts 6 and 7, and instead should have merged the counts for sentencing because they are allied offenses of similar import. The imposition of separate sentences on allied offenses of similar import renders a sentence contrary to law. *See generally State v. Reyes*, 2019-Ohio-4795, ¶ 8 (8th Dist.). The State concedes this error and asks us to remand the matter for the limited purpose of resentencing. We therefore vacate the sentence imposed and remand this matter for the limited purpose of resentencing on Counts 6 and 7 only.

{¶ 54} Hicks's fourth assignment of error is sustained.

**{¶ 55}** Judgment affirmed in part, vacated in part, and remanded for the limited purpose of resentencing on Counts 6 and 7.

It is ordered that the parties share equally the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for resentencing.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

MARY J. BOYLE, P.J., and
SEAN C. GALLAGHER, J., CONCUR